**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 19, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JEFF MACON,

      Plaintiff – Appellant,

v.

UNITED PARCEL SERVICE, INC.,

      Defendant – Appellee.

No. 12-3080

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:10-CV-02327-JAR)**

---

Robert G. Harken (George A. Barton with him on the brief) of Law Offices of George A. Barton, P.C., Kansas City, Missouri, for Plaintiff – Appellant.

Laurence R. Tucker, Kansas City, Missouri, (Thomas B. Weaver, St. Louis, Missouri; Meredith J. Rund, Kansas City, Missouri, with him on the brief) of Armstrong Teasdale LLP, for Defendant – Appellee.

---

Before **GORSUCH**, **EBEL,** and **O'BRIEN**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

United Parcel Service (UPS) fired Jeff Macon for dishonesty. He claims this stated reason was a pretext; he was actually fired because he exercised his rights under the Kansas worker's compensation statute. In entering a summary judgment in favor of

UPS, the district judge concluded the uncontested facts showed UPS to have honestly believed Macon was dishonest and discharged him in good faith. Irrespective of his complaints about pretext and disparate treatment by supervisors, the final decisionmaker for UPS, a regional independent union/management grievance panel, conducted an investigation and decided discharge for dishonesty was appropriate. Based upon that independent and informed decision, we affirm.

## BACKGROUND AND PROCEDURAL HISTORY

UPS hired Macon in 2001 as a part-time preloader. In 2004, he became a package car driver in UPS's Lenexa, Kansas, "North Center." In February 2007, he suffered the first of two separate work-related injuries to his right elbow. Both were covered under worker's compensation (WC). UPS paid about $678 to treat the first injury, which did not cause Macon to miss work. Later, on May 21, 2008, he suffered the second injury to his elbow, which required cortisone injections and surgery on August 21, 2008. He continued working up to the time of his surgery, but after surgery he was not able to return to work until December 4, 2008. UPS incurred $34,339 in costs for treatment of his second injury. Even after the surgery, Macon was unable to recover about 7% of the function in his right arm so UPS offered him a settlement of $6,976. On March 16, 2009, he accepted the offer.

Prior to his second injury and absence in 2008, Macon had only been disciplined once. That discipline commenced on April 30, 2008, about three weeks before his second injury. UPS sent him a termination letter for improperly signing for a customer's next-day air delivery. He invoked the union's grievance procedure, and on May 8, 2008,

a local grievance panel, consisting of an equal number of union and management members, reduced the termination to a suspension.

Under the UPS grievance procedure, an employee may protest any discipline. A protest triggers review by a local grievance panel. If the grievance cannot be resolved at the local level, it escalates to a regional committee. The regional grievance panel also consists of an equal number of representatives from the union and UPS. But where, as here, the employee's home facility is in Kansas, the regional panel is made up of management representatives from Missouri or Nebraska and union representatives from a local union other than that of the grievant.

In deposition testimony relating to this case, both UPS management officials and union representatives testified about the May 2008 grievance proceedings. During those proceedings, they reviewed Macon's delivery records and observed that in addition to the improper signing for next day air, he was also improperly recording multiple stops at locations with a central receiving location like a mailroom. He was advised to stop doing so. As UPS explains, because "[t]aking credit for more stops increases a driver's 'planned day,'" this improper recording practice would undeservedly increase Macon's compensation. (Appellee Br. 16.) In response, Macon claims he was "never . . . trained on UPS' delivery and recording procedures" and says "UPS agreed to provide [him] with training on [its] delivery and recording method[s]." (Appellant Br. 10-11.)

After Macon returned to work in December 2008, he was repeatedly disciplined. Most of the incidents involved safety procedures and failing to properly document breaks

and trips. On March 12, 2009, UPS sent Macon a termination letter for driving without a safety belt and leaving a package unattended. Later, on July 20, 2009, Macon's supervisor, Kelly Ceesay, issued a pending termination letter for safety-related infractions. Both terminations were reduced to suspensions by local grievance panels. Finally, on November 3, 2009, after a review of drivers' delivery records, Ceesay determined Macon again improperly took credit for multiple stops at locations with centralized package delivery. Although Macon claimed "he did not understand that he was improperly recording the stops" (App'x Vol. VII at 1146), UPS issued another termination letter. This time, the local grievance panel could not resolve the matter, so it went to a regional grievance panel, which upheld the termination.

Macon then filed this action in federal district court. His complaint alleged "UPS terminated [his] employment . . . because of his work related injury." (App'x Vol. I at 13.) Following discovery, UPS moved for summary judgment arguing Macon failed to show the necessary causal connection between his 2007 and 2008 WC claims and his 2009 termination. In addition, it argued Macon's claims failed under the summary-judgment framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), because he had not shown UPS's stated reason for his termination—dishonesty—was merely a pretext for retaliation.

The district judge agreed on both counts. First, noting a causal connection between a protected WC claim and termination is usually established through close temporal proximity, she concluded "[t]he period of fifteen months between the filing of

- 4 -

[Macon's second WC] claim and the discharge does not demonstrate close temporal proximity." (App'x Vol. VII at 1149.) She also rejected Macon's invitation to focus on the interval between the *settlement* of his second claim and his termination because, even if the date of claim settlement (March 16, 2009) rather than the date of claim filing was the proper focal point, the seven-month delay still failed to credibly demonstrate impermissible retaliation.

Finally, she rejected as inadequate Macon's attempt to demonstrate why UPS's stated explanation for his discharge could reasonably be considered pretext. Macon relied on his lack of training on the proper reporting of deliveries and inconsistencies in the way UPS disciplined other employees for similar violations. The judge, unconvinced, decided he had shown no reason to doubt UPS's good-faith belief that he knew how to record his package deliveries. She also concluded he had failed to show his situation was comparable to the other employees who were not disciplined.

## DISCUSSION

Macon contends both prongs of the judge's conclusion are error. We see it differently. Even if we assume, arguendo, a causal connection between his WC claims and his discharge, Macon failed to produce evidence sufficient to enable a reasonable jury to conclude the stated reason for his discharge—dishonesty—was a mere pretext.

We review the district court's summary judgment de novo. *Commerce Bank, N.A. v. Chrysler Realty Corp.*, 244 F.3d 777, 779 (10th Cir. 2001). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153,

1160 (10th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  A dispute is genuine when a reasonable jury could find in favor of the nonmoving party on the issue.  *Id.*; *see Anderson v. Liberty Lobby, Inc*., 477 U.S 242, 248 (1986).  In making this determination, "we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."  *Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1225 (10th Cir. 2000).

This case arises from our diversity jurisdiction.  *See* 28 U.S.C. § 1332.  We apply the substantive law of the forum state—in this case, Kansas.  *See Commerce Bank*, 244 F.3d at 780.  Under Kansas law, an employer cannot discharge an employee for filing a WC claim.  *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002); *see Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1196 (10th Cir.), *cert. denied*, 133 S. Ct. 413 (2012).  To establish a claim for a retaliatory discharge under Kansas law, a plaintiff must show:  (1) a claim for worker's compensation benefits or an injury that might support a future worker's compensation claim; (2) the employer knew of the claim or injury; (3) the employer discharged the plaintiff; and (4) a causal connection between the claim (or injury) and the discharge.  *Rebarchek v. Farmers Co-op. Elevator & Mercantile Ass'n*, 35 P.3d 892, 899 (Kan. 2001).

With respect to WC retaliation claims Kansas has adopted a common aspect of federal law.  It applies the burden-shifting framework, as outlined in *McDonnell Douglas*

*Corp. v. Green*,[1] to determine whether retaliatory discharge claims can survive a motion

for summary judgment. *Rebarchek*, 35 P.3d at 898; *Jones*, 674 F.3d at 1196. Under this

framework, once the plaintiff establishes a prima facie case, the burden of avoiding

summary judgment shifts to the employer who must then identify a "non-retaliatory

reason for the discharge." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1116

(10th Cir. 2001). If the employer does so, the plaintiff must then produce evidence

showing the termination was a pretext for the impermissible retaliation. *Rebarchek*, 35

P.3d at 898; *Kendrick*, 220 F.3d at 1226. Such a showing, so long as it would allow a

reasonable jury to find the discharge was pretextual, entitles the plaintiff to proceed to

trial.[2] *See Kendrick*, 220 F.3d at 1226; *Thomas*, 631 F.3d at 1160 ("An issue of fact is

---

[1] 411 U.S. 792 (1973).

[2] According to UPS, under Kansas law a plaintiff is required to show "clear and convincing" evidence of retaliatory discharge at the summary judgment stage even though Kansas courts apply that standard only at trial (not on summary judgment). (Appellee Br. 19, 20.) We have said as much in prior cases. *See*, *e.g.*, *Rebarchek,* 35 P.3d at 897-98; *Foster*, 293 F.3d at 1194-95; *Bausman,* 252 F.3d at 1115-16. In *Foster*, for example, we said: "[a]lthough it is true that a Kansas court will not apply the clear-and-convincing standard at the summary judgment stage in an action for retaliation in the state's own courts, a federal court sitting in diversity will be guided by federal-law standards governing summary judgment procedure." 293 F.3d at 1194-95. Thus, "a plaintiff in federal court who opposes a summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate factfinder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer." *Id.* at 1195; *see also In re B.D.-Y.*, 187 P.3d 594, 697-98 (Kan. 2008) (refining Kansas's definition of "clear and convincing" evidence).

The decision in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010) may call *Foster*'s analysis into question. The Supreme Court's opinion construed 28 U.S.C. § 2072(b), which restricts the scope of federal procedural

(Continued . . . )

genuine if the evidence is such that a *reasonable jury* could return a verdict for the non-moving party on the issue") (emphasis added and quotation omitted).

## I.  PRETEXT

Through three arguments, Macon contends the available evidence raises a genuine issue as to whether his alleged dishonesty was a pretext for terminating him in retaliation for his WC claims.  In his view, the record shows:  (A) UPS engaged in a pattern of retaliatory conduct; (B) he was not, in fact, dishonest; and (C) other similarly situated employees were not terminated for the same offense.[3]  We have reviewed the documents Macon cites, but none raise a genuine and material issue of fact sufficient to allow a reasonable jury to find pretext.  *See Thomas*, 631 F.3d at 1160.

rules:  they "shall not" alter "any substantive right."  "A federal rule, therefore, cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right."  *Id.* at 423 (Stevens, J., concurring); *see also James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir. 2011) (noting Justice Stevens' concurrence provides the controlling analysis in *Shady Grove*).  *See generally Garman v. Campbell Cnty. Sch. Dist. No. 1*, 630 F.3d 977, 983-85 (10th Cir. 2010) (applying the Supreme Court's teaching).

*Shady Grove* was not cited by either party here or in the district court with respect to its possible impact on *Foster*, and we are reluctant to address such an important issue which was not briefed (or even raised).  Fortunately, we need not do so.  If *Foster* still controls, the district judge erred in applying the more lenient "preponderance of the evidence" standard.  (App'x Vol. VII at 1147.)  But since the possible error resulted in a more favorable treatment of Macon's claims, it was harmless as to him.  *See* Fed. R. Civ. P. 61 ("At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").  Under our analysis, Macon's claims fail under either the clear-and-convincing or the preponderance-of-the-evidence standard.

[3] Macon makes these arguments in a different order, but we address his "pattern of retaliatory conduct" argument first because it exposes a weakness undermining all of his arguments.

Pretext can be inferred from evidence revealing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation for the termination. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted). Although a plaintiff need not employ any particular approach to show the defendant's stated reason for discharging him is pretextual, we identified three typical methods in *Kendrick v. Penske Transportation Services, Inc.*:[4] (1) "evidence that the defendant's stated reason for the adverse employment action was false"; (2) "evidence that the defendant acted contrary to a written . . . policy prescribing the action to be taken by the defendant under the circumstances"; or (3) "evidence that the defendant acted contrary to an unwritten policy or contrary to [the employer's] practice when making the adverse employment decision affecting the plaintiff." 220 F.3d at 1230 (quotations and citations omitted). Regardless of which methods the plaintiff uses, "[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (quotations omitted). Macon relies on the first and third of the *Kendrick* methods.

A.    Pattern of Retaliatory Conduct

Macon, taking the first approach identified in *Kendrick*, argues two UPS supervisors—Division Manager Gary Allen and On-Car Supervisor Kelly Ceesay—

---

[4] Both parties cite and rely on this case.

- 9 -

began systematically disciplining him soon after he returned to work following his surgery. In his view, the timing of this intense discipline demonstrates UPS's retaliatory motive and the pretextual nature of his termination.[5] His argument fails to account for the independent assessment of the regional grievance panel.

When an employer vests a supervisor with the power to terminate an employee, our assessment of pretext focuses on the supervisor. *See Kendrick*, 220 F.3d at 1231 ("[A] challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate."); *Long v. Eastfield College*, 88 F.3d 300, 306-07 (5th Cir. 1996). But if the supervisor's ability to make employment-related decisions is contingent on the independent affirmation of a higher-level manager or review committee, we focus on the motive of final decisionmaker. *Id.* at 307; *see Kendrick*, 220 F.3d at 1231-32. In short, we assess pretext by looking at the final result of the disciplinary process, not the acts or motives of those who may be in the decision-making chain. However, if the final decisionmaker merely relies on possibly biased reports or conclusions of others, rather than conducting an independent investigation, our focus shifts back to the supervisor. *See E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484-85 (10th Cir. 2006). Under what we have described as a "rubber stamp" or "cat's paw" theory of liability, an employer can be liable for the acts of a biased supervisor even

_____

[5] To be clear, Macon does not contend the alleged discipline was impermissibly retaliatory in its own right. He argues only that the timing of the discipline reveals UPS's retaliatory motive in terminating him.

- 10 -

if final discipline is imposed by a seemingly neutral higher authority.  *Id*.; *Kendrick*, 220 F.3d at 1231.

Here, although Ceesay started the process leading to his termination, Macon's grievance triggered a review process which appropriately constrained any improper motive by either Ceesay or Allen.  The panel, acting in accord with UPS's written policies, independently assessed Macon's alleged misconduct and agreed upon the propriety of the discipline.[6]  Macon has not explained how any retaliatory motive on the part of Ceesay or Allen can be imputed to UPS when the final decision to terminate him was made by this grievance panel.  Nor has he alleged the grievance panel was biased, had a retaliatory motive, or merely rubber-stamped Ceesay's decision to terminate him. The discipline imposed after the settlement of his WC claim does not raise a triable issue of pretext.[7]

---

[6] Macon does not argue the safety-related discipline he cites played any role in the grievance panel's decision.

[7] Macon relies heavily on the discipline recommended by UPS Division Manager Gary Allen to establish his "pattern of retaliatory conduct." (Appellant Br. 44.)  Macon describes Allen's disciplinary efforts as "false or exaggerated." (Appellant Br. 45.)  Even if we could focus on the actions of individual supervisors rather than the grievance panel making the final decision to terminate, Macon's argument would still be unpersuasive.
Allen attempted to terminate Macon on March 6, 2009, for driving a short distance without his seatbelt and leaving a package unattended in his truck.  Macon admits he committed this infraction, but suggests Allen's decision to terminate him based on this incident was overzealous.  The grievance panel reviewing the incident appears to have agreed; it reduced the termination to a suspension.  When Macon returned to work after the suspension, Allen again attempted to terminate him for failing to wear his seatbelt. Macon denied the allegation, and, given a lack of verification, a grievance panel reduced
(Continued . . . )

- 11 -

B.       Honesty in Delivery Reporting

Macon makes a second argument, also based on the first of the *Kendrick* methods: a jury could determine his discharge for dishonesty was pretextual because the record shows he was not dishonest.  He cites his affidavit, in which he denied having ever been instructed not to take credit for multiple stops when delivering multiple packages to a single location and averred that UPS promised to provide him with delivery-reporting training.

Even if Macon is right, we must examine the facts as they appeared to the regional grievance panel when it made the decision to terminate him.  *See Kendrick*, 220 F.3d at 1231.  Here, it is undisputed that, in April 2008, UPS disciplined Macon for falsifying delivery records.  Although, at that time, UPS had attempted to terminate Macon for

the discipline to a warning letter.  Macon complains Allen attempted to terminate him a third time on July 21, 2009, for "not completing his DVIR book . . . , gawking at a girl, leaving a package in a cab, being in an accident, not using his horn, and not turning his wheels into the curb."  (Appellant Br. 14.)  Macon again denied the allegations, but later agreed to a two-day suspension in the grievance process.

There are two problems with citing this pattern of discipline as an indicator of pretext.  First, Macon has failed to explain how Allen's motive was pertinent to Ceesay's decision.  Even assuming Allen wished to terminate Macon for exercising his WC rights, Macon advances no evidence or argument sufficient to allow a jury to infer Ceesay—who initiated Macon's termination—shared Allen's retaliatory motive.  Second, Macon has failed to discredit the obvious explanation for Allen's discipline:  the increased supervisory scrutiny and discipline was an appropriate result of his poor adherence to UPS's safety and documentation procedures.  Indeed, given Macon's admission relating to the March 6, 2009, infractions, a reasonable jury could not find Allen's subsequent scrutiny indicated a retaliatory motive.  *See Thomas*, 631 F.3d at 1160.

In any event, since we conclude the proper inquiry is whether pretext can be inferred from the independent decision of the regional grievance panel, which made the final termination decision here, pretext cannot be inferred from the actions of either Allen or Ceesay.

improperly signing for a customer's next-day-air package, this caused the members of the grievance panel to review his delivery records. There appears to be consensus among the UPS managers and union members who testified about the 2008 grievance hearing that this review of Macon's delivery records also revealed he was taking credit for making multiple stops when he delivered multiple packages to an address with a central receiving location.[8]

---

[8] According to the deposition testimony of Hamilton Terrell, a "preload manager" with UPS, the grievance panel reviewed Macon's records "with regard to multiple package deliveries being delivered at a central delivery location." (App'x Vol. I at 106.) He said these issues were explicitly discussed with Macon present and Macon was clearly told how to record these stops correctly.

Donald Lewick's deposition confirms this account. Lewick, a labor manager for UPS, stated at the hearing, "we went through the delivery records and there were numerous things that he was doing that were not right and particularly in taking credit for additional stops at locations that he shouldn't be." (App'x Vol. I at 123.) "[H]e was also receiving additional pay based on his falsification of those records." (App'x Vol. I at 124.) When Lewick was asked whether Macon understood "that he was recording his stops improperly at the locations that were discussed at the hearing," Lewick said, "Yes, he did."

The testimony of two UPS package car drivers, Mark Von Elling and Jeff Dossett, who participated in Macon's hearing as union representatives, is equally telling. Von Elling remembered the multiple delivery issue being discussed. At his deposition, he testified: "Jeff was told that if you are making a delivery there, that it's fine if you want to mark these down as suite numbers, but these are all one stop if you get one signature, and needs to be counted as such." (App'x Vol. I at 140-41.)

Dossett had the same recollection:
**Counsel**: "Do you have any specific recollection . . . of the termination that occurred with regard to Jeff Macon in April of 2008?"
**Dossett**: "Yes, I do. . . . My understanding was he was delivering air stops to a building, sheeting them up separately. It was different suites, I mean. And putting them all together and taking them to one place and delivering them all at once."
**Counsel**: "And is that something that you understood to be proper
(Continued . . . )

- 13 -

procedure under UPS policy?

**Dossett**: "No."

. . . .

**Counsel**: "And what is your recollection as to what was discussed [at the hearing]?"

**Dossett**: "It was discussed how Jeff had falsified his record basically and tooken [sic] credit for all these stops, you know, these air stops, delivering them all to one place when they were supposed to go to different suites."

**Counsel**: "And if he was delivering them all to one place . . . explain more about why . . . that is incorrect."

**Dossett**: "Cause they weren't going to where they were supposed to go. . . . They were supposed to go to each individual suite, but he had found a way to put them in some mail room, if I recollect, and then leave them there and have one person sign for them so he didn't have to take them but he was still taking credit for them in the board."

**Counsel**: "So . . . under UPS policy if packages are delivered to a mail room or to a central location, would it be proper for that driver to take credit for all of those stops . . . ?"

**Dossett**: "No, it would not."

**Counsel**: "And there were delivery records that were discussed as part of this local hearing?"

**Dossett**: "Yeah. I believe so, yes."

. . . .

**Counsel**: "And at that local hearing was there any instruction provided to Mr. Macon regarding how to properly record his stop?"

**Dossett**: "Yes, there was."

(App'x Vol. I at 146-47.)

Except for Macon's allegation to the contrary, the record reflects consensus: the local grievance panel reviewed Macon's delivery records and warned Macon to stop taking credit for more than one delivery at locations with central delivery locations.

In October 2009, more than six months after Macon settled his second WC claim, UPS found Macon had again taken credit for delivering multiple packages to a single address. Macon admits doing so. In summary, the record provides ample objective evidence of UPS's honest belief that Macon had been apprised not to take credit for making multiple deliveries at sites with centralized delivery locations. Given the consensus among UPS managers and union representatives that Macon was instructed about the proper delivery recording practice, there is no reason to suspect the grievance panel's termination decision was false or unworthy of belief. *See Kendrick*, 220 F.3d at 1230-31; *see also Anderson*, 477 U.S. at 249-

(Continued . . . )

- 14 -

Nevertheless, Macon's position is clear: without the promised training, he would never "know how to properly record the number of stops for his deliveries." (Appellant Br. 39.) Thus, he claims he was not dishonest, merely inadequately trained. But he is not entitled to a determination of whether he was dishonest; rather, he is entitled only to a determination of whether the terminating grievance panel could reasonably have thought so. *See Rivera,* 365 F.3d at 924-25.

Furthermore, Macon has not explained why this dispute over training renders the grievance panel's belief unreasonable. Even assuming UPS had promised him more extensive training on proper delivery reporting, the correction resulting from the 2008 grievance hearing (as UPS managers and employees described it in deposition testimony), was sufficient to enable him to honestly record deliveries to sites with a central delivery location. In light of the ample evidence supporting the grievance panel's reasonable belief that he had been dishonest in his delivery reporting, Macon cannot avoid summary judgment by simply pointing to some scant and undeveloped evidence of an honest misunderstanding. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

---

50 (explaining that, although we do not "weigh the evidence and determine the truth of the matter," we must "determine whether there is a genuine issue for trial" supported by sufficient evidence "for a jury to return a verdict for [the nonmoving] party").

C.    Similarly Situated Employees

Finally, Macon attempts the third approach identified in *Kendrick*—showing a deviation from the employer's customary practice.  Under this approach, a plaintiff can demonstrate pretext "by providing evidence that he was treated differently from other *similarly-situated* employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1231 (emphasis added).  Macon claims he established a triable issue of pretext by showing another package car driver, Tim Kelly, improperly reported his deliveries but was not terminated.[9]

To establish that a comparison employee is similarly situated, the plaintiff must show "the employee deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'" *Id.* at 1232.  Macon makes no attempt to show the grievance panel, which made the final decision to terminate him, treated employees differently.  Rather, he tries to focus on his supervisor, Kelly Ceesay, even though she was not the final decisionmaker.

The problem with Macon's approach is that it fails to give UPS credit for establishing grievance panels with independent authority to assess the propriety of discipline.  Even assuming the difference in treatment between Macon and Tim Kelly resulted from Ceesay's desire to terminate Macon in retaliation for his WC claims, this

---

[9] In his opening brief, Macon also tells us two other package car drivers, Derrick Cook and Jim Crunk, improperly reported their deliveries and were not terminated.  We decline to consider these comparisons because he failed to make them in his briefing to the district court.  *See Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1127 (10th Cir. 2011) (we do not normally consider arguments not presented to the district court).

improper motive cannot be imputed to UPS when the independent grievance panel concluded there was adequate reason to terminate Macon for dishonesty. If there was some reason to believe the grievance panel shared Ceesay's retaliatory motive, refused to consider evidence showing Ceesay's retaliatory motive, or made its decision before Macon became aware of evidence of retaliatory motive, there might be occasion for a deeper judicial inquiry. *See BCI Coca-Cola Bottling Co.*, 450 F.3d at 485-86. But, Macon simply does not argue—and nothing in the record suggests—the grievance panel was in any way complicit in or blind to Ceesay's retaliatory motive. On the contrary, the grievance panels' frequent intervention on Macon's behalf in the past strongly indicates their willingness to intercede when supervisors recommended excessive discipline and suggests their healthy skepticism of his supervisors' attempts to over discipline him. There was no deviation from UPS's customary practice of permitting a grievance panel to make the final disciplinary decision. Macon's attempt to compare supervisors' treatment of him with their treatment of Tim Kelly is beside the point, and his disparate treatment argument fails for that reason alone; but a more fulsome analysis nails the coffin closed.

Macon has also failed to show two other important aspects of similarity. First, as the district court pointed out, he has not shown Tim Kelly to have been in a comparable position with respect to his disciplinary record. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) ("A court should also compare the relevant employment circumstances, such as work history . . . , applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated."). Indeed,

even though the district judge specifically pointed out this defect in Macon's case,[10] Macon has not addressed it in his brief here. Accordingly, even if UPS had reason to believe there might be an irregularity in Tim Kelly's reporting, any difference in UPS's choice in how to address the problem with him could have legitimately stemmed from differences in their disciplinary histories rather than from a retaliatory motive toward Macon.

Second, Macon has not demonstrated how Kelly Ceesay, who also supervised Tim Kelly, knew of any irregularities in Kelly's reporting of deliveries to central receiving locations. Macon alleges Kelly had been warned about taking credit for multiple stops when delivering packages to a central delivery location. According to Macon, when Kelly continued to take excessive credit for multiple deliveries, even after being warned not to do so, Ceesay did not discipline him. However, Macon has not shown UPS supervisors to have actually known of Tim Kelly's errors and disregarded them. To the contrary, in his response to UPS's summary judgment motion, he acknowledged that UPS "never investigated Tim Kelly to determine whether or not he was improperly recording the number of stops." (App'x Vol. II at 225.)

Macon relies on deposition testimony from Ceesay to suggest she knew Kelly was not properly recording stops but refused to act. However, the deposition testimony shows Ceesay to have been aware of the problem with respect to Macon only because she knew

---

[10] Because the burden is on the plaintiff to show pretext, Macon had the responsibility to show Kelly was similarly situated. *See Rebarchek*, 35 P.3d at 898.

his route well enough to spot the problems. She left her position before she had time to consider investigating the routes of Kelly or any other drivers:

> Q. And as far as Cowart, [Tim] Kelly and Schleicher and those other drivers, when you looked at [the] ODSE system, did any of them indicate to you that look, these guys aren't properly recording their multiple packages being delivered to a single-point stop?
> A. *No, because I know Macon's route better than I know any of their routes.*
> Q. What about Macon's route that you know about that allowed you to – that's different from Cowart and Kelly's and them?
> A. Because I've done his route and I know where the single-point deliveries are.
> Q. So . . . did you ever see as far as Cowart or Kelly or Schleicher where they would have -- you know, like here there would be multiple lines where it says left at customers, the same address, but they would have say different suites; do you recall seeing that at all?
> A. *Probably. I don't remember. I'm sure they did.*
> Q. And it would have the same person's signature. Like here where it says Cohen multiple times they would have the same signature as well?
> A. I'm sure they did.
> Q. Did those ever prompt you to say hey, maybe I need to sit down with them and see if they're properly recording their package deliveries at these single-point stops or try to find out if, in fact, they are single-point stops first?
> A. Well, I looked at Macon's first because I know this route.
> Q. After you looked at Macon's did you look at Cowart's or Kelly's or any of those [13] other drivers?
> A. *I left north center.*
> Q. *How soon after did you leave north center?*
> A. *Two weeks.*
> . . . .
> Q. You didn't discuss the termination of Jeff Macon with any UPS supervisors or managers?
> A. I'm sure they knew about it when he got fired. It was after I talked with my supervisor, Kevin Stark.
> Q. What did you talk with Kevin Stark about?

A. About what Macon was doing.

Q. Did you show him -- you know, did you go hey, you need to look at the ODSE system? Did you talk about what you saw in the ODSE system with Kevin Stark?

A. Yes.

Q. Did you ever tell him hey, same thing might be happening with Steve Cowart, Tim Kelly or Matt Schleicher?

*A. No, because I didn't know that.*

*Q. It didn't prompt you to do an investigation on that to see if they were making these deliveries at single-point stops?*

*A. No.*

. . . .

Q. You just brought up what you saw in the ODSE system and felt that he should have been terminated for that?

A. Yes.

Q. And why should he have been terminated for it?

A. Because UPS takes stealing time very seriously and falsifying records very seriously.

(App'x Vol. II at 369 (emphasis added).)

Ceesay's uncontroverted deposition testimony shows she was not aware of any continuing reporting issue with Tim Kelly. Because she lacked specific knowledge that Kelly was not properly reporting his stops, he was not situated similarly to Macon.

AFFIRMED.