**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JEREMY DIDIER,

    Plaintiff - Appellant,

v.

ABBOTT LABORATORIES; ABBOTT
LABORATORIES, INC.; ABBOTT
PRODUCTS, INC.; ABBVIE, INC.,

    Defendants - Appellees.

No. 14-3125
(D.C. No. 2:13-CV-02046-JWL)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **HOLMES**, and **PHILLIPS**, Circuit Judges.
_____

From 2002 until her termination in 2012, Jeremy Didier, a woman, was an employee of Abbott Laboratories ("Abbott") and its predecessor Solvay Pharmaceuticals ("Solvay"). Didier began working at Solvay as a sales representative, and by 2010 she had been promoted to the position of District Manager. Her promotion brought with it a new supervisor, K. Byron Rex. Didier contends that while they worked together Rex made numerous comments about her ability to balance caring for her young children with her work responsibilities, comments he never uttered to male employees with young children.

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Three events form the backdrop of this case. First, in 2011 Didier requested and was granted intermittent leave under the Family Medical Leave Act ("FMLA") to take her two young children to medical and therapy appointments for a few hours each week. Second, later in 2011, Didier submitted what the company considered an inappropriate reimbursement request for gifts to the sales representatives she supervised. She had been counseled against making such requests, and Abbott's continued concern over problems in her expense reports led it to launch an investigation. Third, and concurrent with this investigation, Rex expressed concern over other reimbursement requests Didier submitted. Abbott's numerous concerns regarding Didier's reimbursement requests led it to launch a second investigation that culminated in Didier's termination in March 2012.

After her termination, Didier filed charges with the Equal Employment Opportunity Commission ("EEOC"). She alleged sex and religious discrimination, interference with her FMLA rights, FMLA retaliation, and other violations not pursued on appeal. Didier eventually received a right-to-sue letter and filed suit in federal district court. She alleged claims similar to those she had brought before the EEOC.

After the parties conducted discovery in district court, Abbott filed a motion for summary judgment on all claims. Without a hearing, the district court granted summary judgment in Abbott's favor. Didier now appeals the district court's grant of summary judgment on three of the five claims she raised below: (1) sex

2

discrimination under Title VII; (2) FMLA interference; and (3) FMLA retaliation. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND[1]

### A. Factual Background

From 2002 until 2010, Didier was an employee of Solvay. After Abbott acquired Solvay in 2010, Didier became an employee of Abbott and remained as such until her termination on March 8, 2012. During her employment with Solvay/Abbott, Didier was promoted three times, her last position being Kansas City District Manager. Her final promotion to District Manager was approved by the man who became her direct supervisor, K. Byron Rex.[2]

Before turning to Didier's termination, we first lay out a few necessary details regarding the background of her employment and her relationship with her supervisor. The first details pertain to her supervisor. Didier contends that Rex has a history of making inappropriate comments regarding his views on the role of women in society and in the workplace. Didier highlights the following: (1) in 2001, Rex voiced his opinion that young women with children should stay home, suggesting to a female sales representative who resigned after these comments that she should

---

[1] As this matter is before us on summary judgment, we state the facts in the light most favorable to Didier, the nonmoving party. *See Bohn v. Park City Grp., Inc.*, 94 F.3d 1457, 1460 (10th Cir. 1996).

[2] There is some dispute between the parties over the exact selection process, and in particular whether Rex selected Didier "from all of the other sales representatives in the district." Regardless, there is no dispute that her promotion was subject to his approval.

welcome the opportunity to remain home with her children; (2) in 2009, Rex questioned Didier during her district-manager interview about whether she could do the job with four young children and a husband who worked full-time; (3) in 2009, Rex urged Didier not to report a male employee who was making false and disparaging comments about her, and then became angry at Didier after he was reprimanded for giving that advice; (4) in 2010, Rex reported Didier for personal use of a corporate credit card although he had failed to report his male subordinates for similarly using their corporate cards for personal expenses despite their frequently doing so; (5) in 2012, Rex instructed Didier to "focus on your faith and your family" when she expressed worry for her job security during Abbott's investigation of her, and he repeatedly sought assurances from Didier throughout Abbott's investigation that her husband had a good job and that her family "would be okay" if she was fired; (6) in 2012, during a discussion of a female sales representative, Rex mentioned to Troy Petrick, a District Manager, that one way to get rid of employees was to turn them in for expense-reporting violations; and (7) in 2012, after Didier's termination, Rex raised concerns with Terri Garrett, Didier's successor as District Manager, about the commitment of two high-performing female representatives to their work due to their childcare responsibilities.[3]

The second pieces of necessary background concern Abbott and Solvay's reimbursement policies for food reimbursement and travel booking. Regarding food

---

[3] Didier also notes that concerns about Rex's attitude towards women in the workplace eventually caused Garrett, also a woman, to leave Abbott.

reimbursement, Solvay had a written policy stating that employees could incur only those travel and entertainment expenses that were reasonable and necessary to conduct business: for meals, it offered ballpark figures of $15 for breakfast, $20 for lunch, and $50 for dinner. Abbott's policies and approval procedures are a bit more detailed and are contained in its Travel & Entertainment ("T&E") policy. The T&E policy requires supervisor approval of all corporate expenses, prohibits reimbursement for personal expenses, and disallows corporate reimbursement of expenses incurred for anyone other than an Abbott employee (except for meals for spouses required to attend an Abbott event). Abbott generally reimburses dinner expenses only for employees traveling overnight on a business trip, but if an employee is not traveling overnight on a business trip, the policy also reimburses dinner when an employee arrives home late due to work if the employee annotates such an expense in the explanation of her expense report.

Despite these clear policies, Didier maintains there were also certain unwritten guidelines regarding travel and food expenses that were widely known and followed by employees at both Solvay and Abbott. These included wide latitude regarding the application of suggested amounts to food expenses, which she contends meant she could apply that amount towards the cost of a meal that she ate either by herself or with her family. Didier states that she frequently did this, and that Rex routinely approved these expenses when he was her supervisor at both Solvay and Abbott.

Concerning travel booking, only Abbott's policies are relevant here. Abbott requires employees to book all travel through its authorized travel agency. If for

whatever reason an employee must book travel through an alternative channel, she must submit a Travel Agency Exception Form together with her expense report for corporate reimbursement. Among other requirements, this form requires that the employee explain why she did not book her ticket through Abbott's travel agency and requires a signature from her supervisor.

Finally, given that two of Didier's three claims before us concern her use of FMLA leave, we provide background concerning Didier's FMLA usage. In November 2011, Didier began taking intermittent FMLA leave to take her two young sons to therapy and medical appointments for a few hours each week. Rex and his supervisor, Marty Comer, were aware of Didier's FMLA leave. In 2012, Didier took a few hours of such leave on January 9th, 12th, 18th, 20th, and 27th, as well as February 6th and 10th.

We now turn to the key issues undergirding the claims before us. These began in December 2011, when Didier sought reimbursement for gift baskets she had purchased for members of her sales team. In April and May 2010, Abbott had counseled Didier that such expenses were inappropriate for reimbursement. Abbott's Corporate Disbursement Department flagged this submission, causing Susan Ballard—a Disbursement Analyst—to review more closely Didier's recent reimbursement requests. In her review, Ballard noted that Didier had frequently submitted meals for reimbursement without an overnight stay and—based on these irregularities—Ballard initiated an audit of the past two years of Didier's reimbursement requests. Ballard summarized these findings in a Corporate

6

Disbursement Case Report, which she submitted to Abbott's Office of Ethics and Compliance ("OEC") for further investigation.[4]

Contemporaneous with this series of events, Rex was having his own issues with Didier's unrelated January 12, 2012, expense report. Specifically, Rex had two concerns: (1) Didier had submitted a Travel Agency Exception Form without obtaining his signature (Didier had instead written Rex's name on the signature line and noted that his signature was "on file"); and (2) Didier had submitted for reimbursement a dinner on January 2, 2012 for her family in the amount of $53.53. Regarding the first concern, Rex discussed with Didier her use of a method other than Abbott's designated travel agency to book travel and asked her to revise and resubmit the form, which he eventually signed. Regarding the second, however, Rex had more issues. He was alarmed both because January 2 was a company holiday on which Didier would not have been traveling for work and because she had submitted an expense for a family dinner. Upon confronting Didier about the family-dinner expense, Rex said to Didier, "Please tell me we've not been paying for dinners for your family all this time." In response, Didier told Rex that he had approved family-dinner expenses for years and that she believed these expenses complied with the T&E policy. While conceding she had not worked on January 2, she also tried to justify the family-meal expense by pointing out that she had an early flight the next morning.

---

[4] The OEC is responsible for ensuring compliance with Abbott's Code of Business Conduct (the "Code").

After this discussion with Rex, Didier called Abbott's Corporate Disbursement Call Center to confirm her understanding of the T&E policy. She alleges that she spoke with DeMario Hudson, a call center representative, and that Hudson told her: (1) that she could claim an expense for a family meal at a reasonable amount as long as she was traveling for at least five hours on the day of the meal, and (2) that her manager had discretion to approve a family-meal expense incurred the night before an early morning departure. Didier sent an email providing a brief summary of her understanding of the call to Rex. But when Rex forwarded this email to Hudson for confirmation, Hudson told him that Didier had inaccurately reported the substance of their call. Rex then informed Didier that Hudson disagreed with her description of the call. Didier contends that she again called Hudson and that he once again confirmed her understanding of the T&E policy; she wrote Rex another email to this effect. Hudson states that, although he and Didier discussed certain reimbursable expenses in both phone calls, they never discussed the reimbursability of family-meal expenses during either call and thus Didier's emails to Rex contending otherwise were inaccurate.

On January 24, 2012, Rex called Abbott's Human Resources Department to voice his concern over Didier's January 12 expense report, both for her writing his name on the signature line without his consent and for her claiming reimbursement for the family-meal expense. He also expressed alarm that Didier had repeatedly misrepresented the content of her discussions with Hudson. In response, Abbott assigned Cherylle LaFleur, an Employee Relations Manager, to investigate Rex's

8

concerns. In the course of her inquiry into Didier's conduct, LaFleur spoke with Ballard to ask some questions about general expense practices. During their discussion, Ballard informed LaFleur that the Corporate Disbursement Department had already separately looked into Didier's expense practices and that Ballard had submitted her findings to the OEC. LaFleur then separately submitted a New Case Report to the OEC. LaFleur's Case Report asked the OEC to investigate whether Didier had: (1) falsified her supervisor's signature/approval on a company document; (2) submitted questionable expenses; and (3) intentionally misquoted Hudson in an attempt to justify her questionable expenses.

The OEC assigned Julie Fendel, a Global Security Investigator, to examine the allegations concerning Didier.[5] Fendel independently investigated the evidence regarding Didier's expense reports and her writing of Rex's name on her Travel Exception Form. Fendel's report concluded that Didier had incorrectly submitted numerous family meals for reimbursement, that her excuse for doing so was "not credible," and that she had not followed appropriate procedures for submitting her Travel Exception Form but had instead tried to circumvent the system by writing that Rex's signature was "on file." Thus, Fendel's investigation determined that Didier's conduct had violated at least two principles of the Code.

When an investigation determines that an employee has violated the Code, Abbott's policies require that the assigned Employee Relations Manager review the

---

[5] Global Security is the division within Abbott that conducts investigations into alleged loss incidents.

investigative findings on a case-by-case basis to determine the appropriate disciplinary action. In Didier's case, this responsibility fell to LaFleur. LaFleur reviewed Fendel's findings and, believing Didier's actions to be egregious and to include intentional attempts to falsify, recommended that Abbott terminate her employment. After recommending a termination, an Employee Relations Manager must under the policy discuss her reasons for recommending termination with the business management team (Rex and his supervisor Comer) to ensure they support the recommendation. Both Comer and Rex supported LaFleur's decision, elevating the recommendation further up Abbott's bureaucratic hierarchy.[6] On March 8, 2012, after all necessary parties had signed off, Abbott terminated Didier's employment.

## B. Procedural Background

On August 13, 2012, Didier filed charges with the EEOC alleging sex and religious discrimination, interference with her FMLA rights, FMLA retaliation, and other violations not raised on appeal. On October 29, 2012, Didier received a right-to-sue letter. On January 25, 2013, she filed the complaint underlying this appeal in federal district court, alleging similar claims to those raised with the EEOC. After discovery, Abbott moved for summary judgment on all claims. Without holding a hearing, the district court granted summary judgment in Abbott's favor. Didier now

---

[6] Per Abbott's policy, the recommendation to terminate Didier had to receive the additional approval of Kristin Slatttery, Senior Employee Relations Manager, Laura Hennessy, Senior Employee Relations Manager, Mindy Necci, Senior Business Human Resources Manager, Kristyn Gamoke, Business Human Resources Director, and Leanna Walther, Business Human Resources Vice President.

appeals the district court's ruling regarding three of the five claims she raised below: (1) sex discrimination; (2) FMLA interference; and (3) FMLA retaliation.

## DISCUSSION

### A. *Standard of Review*

We review de novo the district court's grant of summary judgment. *Manard v. Fort Howard Co.*, 47 F.3d 1067, 1067 (10th Cir. 1995). In doing so, we view all of the facts in the light most favorable to Didier as the non-moving party and draw all reasonable inferences in her favor. *See Bohn v. Park City Grp., Inc.*, 94 F.3d 1457, 1460 (10th Cir. 1996). "Summary judgment is appropriate when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir. 1991).

### B. *Sex Discrimination*

#### i. **Direct or Circumstantial Evidence?**

To prevail on a Title VII sex-discrimination claim, a plaintiff may offer either direct or circumstantial evidence of discrimination. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013). When she offers direct evidence, her claim proceeds without being subject to the burden-shifting framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See also Tabor*, 703 F.3d at 1216. Direct evidence is evidence that, on its face, demonstrates that the employment decision was reached for discriminatory reasons. *Danville v.*

11

*Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002). In contrast, we have held that workplace comments such as those attributed to Rex (1) cannot qualify as direct evidence unless the plaintiff shows that the speaker had decision-making authority and acted on his discriminatory beliefs, (2) do not qualify as direct evidence if the context or timing is not closely linked to the adverse decision, and (3) cannot constitute direct evidence if they can plausibly be interpreted in two different ways—one discriminatory, one benign. *See Tabor*, 703 F.3d at 1216.

Didier claims that the district court should have considered Rex's numerous comments regarding women in the workplace as direct evidence of discrimination. She contends that Rex's comments reflected his animus toward her and related directly to his decision to approve her termination. As support for treating Rex's comments as direct evidence of discrimination, she likens them to similar comments we treated as direct evidence in *Tabor*. Didier further argues that, since she presented direct evidence of sex discrimination, the district court improperly applied *McDonnell Douglas*'s burden-shifting framework and erred in granting summary judgment on her sex-discrimination claim.

Abbott believes the district court correctly determined that Didier could not proceed under the direct-evidence standard to support her sex-discrimination claim. It contends that Didier has presented no evidence demonstrating on its face that her status as a woman with young children either caused Rex to report her violations or caused LaFleur to terminate her employment. It points out that the crux of Didier's evidence is a

number of statements Rex made unrelated to Didier, and that Didier cannot rely on these statements as direct evidence.

Before *Tabor*, we consistently noted that discriminatory remarks in the workplace based on sex stereotypes could not constitute direct evidence of sex discrimination unless they demonstrated an existing policy that itself constituted discrimination. *See, e.g.*, *Heim v. Utah*, 8 F.3d 1541, 1546–47 (10th Cir. 1993); *Ramsey v. City & Cty. of Denver*, 907 F.2d 1004, 1008–09 (10th Cir. 1990). But in *Tabor*, we appeared to carve out a limited exception to that rule. There, the decision-maker made the objectionable comments while interviewing a woman for a promotion she later was denied, and the stereotypes invoked by the decision-maker spoke directly to the plaintiff's fitness to undertake the job for which she was interviewing. *Tabor*, 703 F.3d at 1217. We held that the content of these statements, the interview context in which they were made, and the temporal proximity of the comments to the adverse employment decision directly linked these statements to the decision not to promote. *Id.* Thus, we concluded that these statements constituted direct evidence of sex discrimination. *Id.*

Unfortunately for Didier, the comments she alleges Rex made—while archaic and unsuitable for the twenty-first century workplace—lack either the context, the temporal proximity, or the clear discriminatory connotation sufficient to constitute direct evidence. Considering them individually may help to clarify this conclusion. The first three comments Didier points us to are: (1) in 2001, Rex expressed his opinion that young women with children should stay home, and suggested to a female sales representative who resigned following these comments that she should welcome the opportunity to

13

remain home with her children; (2) in 2009, Rex questioned Didier during her interview for the District Manager position about her ability to do the job because she and her husband worked full time and she had four young children; and (3) in 2009, Rex urged Didier not to report a male employee who was making false and disparaging comments about her, and then became angry at Didier when he was reprimanded for giving that advice. Given that the initial investigation of Didier began in November 2011 and she was fired in 2012, these earlier comments and actions lack sufficient temporal proximity to Didier's firing to amount to direct evidence of discrimination. *Compare id. with Riggs v. AirTran Airways, Inc.,* 497 F.3d 1108, 1118 (10th Cir. 2007) (noting that there must be some "direct link" between the discriminatory treatment and the termination decision, including close temporal proximity, for the treatment to constitute direct evidence of discrimination in the termination decision), *and Stover v. Martinez*, 382 F.3d 1064, 1074 (10th Cir. 2004) (listing cases, including one holding that a four-month period between the protected activity and alleged discrimination lacked sufficient temporal proximity, without more, to support an inference of causation). Similarly, the fourth incident Didier highlights—Rex's reporting Didier for personal use of a corporate credit card but failing to report his male subordinates despite their also frequently using their corporate credit cards for personal expenses—relates to an incident that occurred in 2010. And temporal proximity also dooms the final comment Didier points us to—Rex's raising concerns with Terri Garrett, Didier's successor as District Manager, about the commitment of two high-performing female representatives to their work due to their childcare responsibilities—because this comment occurred after Didier's termination.

14

This leaves the comments Didier relates that are close in time to her termination—(1) Rex's instructing Didier to "focus on your faith and your family" when she expressed worry for her job during Abbott's investigation of her and repeatedly seeking assurances from her throughout Abbott's investigation that her husband had a good job and that her family "would be okay" if she was fired; and (2) during a discussion about a female sales representative, Rex's mentioning to Troy Petrick that one way to get rid of an employee was to turn them in for expense-reporting violations. The comments Rex made to Didier during Abbott's investigation of her fail as direct evidence because they could be interpreted as either discriminatory or benign and thus cannot constitute direct evidence. *See Tabor*, 703 F.3d at 1216. But Rex's comment to Petrick—made while Didier was under investigation—provides the closest call. While both the content and the temporal proximity appear sufficient here for the comment to constitute direct evidence, Rex did not make the comment in reference to Didier. Because of that, we conclude that the comment provides no direct evidence of discrimination but instead significant circumstantial evidence of Rex's discriminatory motive. For all of these comments, then, Didier must rely on *McDonnell Douglas*'s burden-shifting framework.

### ii.    Application of the *McDonnell Douglas* Framework

As noted above, we use the three steps detailed in *McDonnell Douglas* when considering a sex-discrimination claim based on circumstantial evidence. This framework requires that we ask three questions in this order: (1) has the plaintiff established a prima facie case of discrimination?; (2) has the defendant offered a legitimate, nondiscriminatory reason for the employment action?; and (3) assuming the defendant

15

has offered such a reason, can the plaintiff produce evidence that the stated reason is a mere pretext for discriminatory intent? *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). We have held that the burden on both parties in the first two steps is relatively mild. *E.g.*, *Orr v. City of Albuquerque*, 417 F.3d 1144, 1152 (10th Cir. 2005) (noting that the prima facie case is "not onerous"). A plaintiff satisfies the prima facie burden by merely demonstrating that she was part of a protected class, that she suffered an adverse employment decision, and that her employer did not eliminate her position after her termination. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1228–29 (10th Cir. 2000). Similarly, the defendant's burden on the second step is one of production, not persuasion, and we have characterized this burden as "exceedingly light." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011)).

Here, Abbott does not appear to dispute that Didier met her burden on the first prong, but Didier contests that Abbott has met its burden on the second prong. Didier's argument on this score, however, appears to be merely that Abbott has not offered a legitimate reason because its proffered reasons—that Didier falsified an expense report form and submitted numerous improper expenses for reimbursement—should fail. Her rationale behind this assertion is that all such expenses were approved by Rex and there were only a few instances of her seeking reimbursement for family meals. This is an argument more about the wisdom of Abbott's decision than whether its stated reason is legitimate; given the "extremely light" burden on Abbott at this stage, we find this

16

argument unavailing. Since we believe both parties have fulfilled their preliminary burdens here, we shift our focus to the third inquiry required under *McDonnell Douglas*.

In *McDonnell Douglas*'s third step, evidence of pretext may take a variety of forms. These include evidence that: (1) the defendant's stated reason for the action is false; (2) the defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; (3) the defendant has shifted rationales for the adverse employment action; or (4) the defendant has treated similarly situated employees who committed acts of comparable seriousness differently. *Kendrick*, 220 F.3d at 1230; *see also Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196–97 (10th Cir. 2011).

Didier argues that she has provided ample evidence of pretext. She highlights that she was not treated the same as many similarly situated male employees who were not dismissed for violations of company rules of comparable seriousness. Didier disputes the district court's determination that none of these employees were similarly situated and that "no reasonable jury could draw an inference of discrimination based on Abbott's treatment of [these] individuals." Didier also notes that she provided evidence of pretext beyond the similarly situated male employees, such as Rex's discriminatory comments.

Abbott contends that Didier's evidence fails to establish pretext. It notes that, when determining whether a reason is pretextual, we must look at the facts as they appear to the person making the decision. Abbott believes all of the relevant decision-makers in Didier's cases were unbiased in reaching their conclusions that her conduct warranted termination. In addition, it contends that Didier's claim that Rex acted on a belief that mothers with young children should not be in the workplace is "pure speculation and

17

unsupported by admissible evidence." Further, Abbott agrees with the district court that Didier failed to identify similarly situated employees who were treated more favorably than she was treated.

Didier's assertions of pretext on the part of Abbott, then, focus on two distinct groups of evidence: (1) evidence of Abbott's different treatment of similarly situated male employees; and (2) Rex's discriminatory comments. We address each in turn to illustrate why neither demonstrates the pretext necessary to overcome summary judgment in favor of Abbott.

Didier points to evidence of at least four other similarly situated male employees whose discipline she claims Abbott handled differently than her own. The district court found that these employees were either: (1) not similarly situated to Didier; or (2) did not commit acts of comparable seriousness to Didier's. We agree, and we therefore pause to consider each of these employees in turn.

The first employee Didier points to is Rex, who was not terminated despite having approved Didier's questionable expense reports. The district court determined that Rex could not be considered similarly situated to Didier because he was her supervisor. It relied on language from our decision in *Jones v. Denver Post Corp.*, 203 F.3d 748, 752–53 (10th Cir. 2000), which stated that "Canino was one of Jones's supervisors and therefore cannot be deemed similarly situated in a disciplinary matter . . . ." The district court was correct: *Jones* forestalls Didier's argument that Rex was similarly situated.

Didier next points to Ken Davis, a male employee who she contends was not terminated even though he used his corporate card for personal expenses. Here, the

18

district court found that Davis's conduct was not of comparable seriousness to Didier's because, while Davis used his corporate card for personal expenses, he paid American Express for those expenses himself rather than attempting to have Abbott pay for them. Didier disputes this finding, contending that her affidavit alone—without any additional evidence—demonstrates that Davis had also sought reimbursement for improper expenses. The district court found that the evidence Didier presented to suggest that Davis had sought inappropriate reimbursement lacked foundation and was inadmissible, and Didier presents no argument to suggest that this evidentiary determination was an abuse of discretion. *See Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 894 (10th Cir. 1997) (noting that "[l]ike other evidentiary rulings, we review a district court's decision to exclude evidence at the summary judgment stage for an abuse of discretion"). Without any admissible evidence that Davis too asked for reimbursement for improper expenses, we agree with the district court's determination that his conduct was not of comparable seriousness to Didier's.

The comparable seriousness prong also defeats Didier's arguments regarding T.J. Brinkerhoff. Brinkerhoff hired his brother-in-law, but Abbott did not terminate Brinkerhoff even though this hiring violated Abbott's policy prohibiting an employee from hiring his or her relative. Abbott's investigation concluded that Brinkerhoff did not know about Abbott's employment-of-relatives policy and further that Brinkerhoff believed that hiring his brother-in-law would not violate any such policy because they lacked a blood relation. While Didier points out that this violation was initially categorized as being within the same seriousness level as her violation, Abbott and the

19

district court are correct that the comparable-seriousness prong looks to how the offenses are characterized at the conclusion of an investigation—when the decision on appropriate discipline is made—and not at the seriousness of the initial, unfounded accusation. Since Abbott's investigation found Brinkerhoff's conduct to be accidental—while it found Didier's to be intentional—it cannot be said that the company considered his violation to be of comparable seriousness to Didier's when it disciplined him.

This brings us to the final employee Didier points to, Greg Toole. As the district court noted, Toole was similar to Didier in many respects. Abbott determined that Toole had underestimated the personal mileage on his car and therefore owed the company nearly $300 in restitution. As with Didier, Global Security determined that this conduct violated principles 5 and 9 of the Code. And, as with Didier, Abbott's HR department ultimately recommended Toole's termination—a recommendation Rex supported. Unlike Didier, however, Toole was not terminated because Comer and Susan Niver-Percy, the Employee Relations Manager responsible for Toole's case, found that Toole had been following accepted practice at Solvay and may not have received adequate training on Abbott's policies. In Didier's case, by contrast, no one other than Didier contended that the practice she was following regarding family meals had been accepted at Solvay, and—despite repeated opportunities to point to others who believed as she did—Didier could provide no one else who shared her understanding. This distinction makes Toole not similarly situated to Didier in all relevant aspects. *See MacKenzie v. City & Cty. of Denver*, 414 F.3d 1266, 1277 (10th Cir. 2005) (employees not similarly situated if

"differentiating or mitigating circumstances" distinguish their conduct or the employer's treatment of them for it).

Without being able to point to any similarly situated employees, Didier's evidence of pretext must rely on Rex's discriminatory comments. But can Rex's comments support an inference of discrimination on Abbott's part? Since he was not the final decision-maker over Didier's employment, the answer must be no. In *Macon v. United Parcel Service, Inc.*, 743 F.3d 708, 715 (10th Cir. 2014), we held that "if the supervisor's ability to make employment-related decisions is contingent on the independent affirmation of a higher-level manager or review committee, we focus on the motive of [the] final decision maker." Here, Fendel independently recommended Didier's termination and—while Rex signed off on this recommendation—so too did six other individuals with various positions in Abbott's managerial hierarchy. While Abbott's corporate structure causes some confusion about who was the final decision-maker, we are confident that it was not Rex. Didier has presented no evidence pointing to the discriminatory motives of any of the other individuals involved in the decision to terminate her, and absent such evidence her claim must fail at the third stage of the *McDonnell Douglas* analysis.

Didier counters that Abbott should still be liable under a "cat's paw" theory of liability. This assertion, too, is unavailing. To succeed under a "cat's paw" theory of liability, a plaintiff must show that "the decisionmaker followed the biased recommendation [of a subordinate] without independently investigating the complaint against the employee*." English v. Colo. Dep't of Corrs.*, 248 F.3d 1002, 1011 (10th Cir. 2001) (alterations in original) (quoting *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328,

1332 (11th Cir. 1999)). We have required that "a plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process. Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions caused the adverse employment action." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 487 (10th Cir. 2006).

Were Didier to suggest discrimination on the part of Fendel in conducting her investigation, perhaps a "cat's paw" theory would have more traction. But because her assertions of discrimination focus solely on Rex, we need only look to Rex's role in the disciplinary process. Even if Rex's decision to report Didier was motivated by discrimination, we conclude that Fendel's exhaustive inquiry into Didier's expense-records history would constitute the kind of independent investigation sufficient to shield Abbott from liability. Further, even before Rex chose to report Didier, Ballard had already initiated another inquiry into Didier's expense reports. Quite simply, we cannot say that Rex's actions caused Didier's termination.

For these reasons, we affirm the district court's grant of summary judgment on Didier's sex discrimination claim.

## C. FMLA Claims

Didier's other two claims relate to her taking of FMLA leave. First, Didier claims that Abbott illegally interfered with her FMLA leave by terminating her while she was still occasionally taking intermittent FMLA leave to attend medical and therapy appointments for her two young sons. Second, she claims that her termination was in

retaliation for her taking of FMLA leave. Because these claims look to similar factors, we consider them together here.

First, we consider the standards for an FMLA-interference claim. The FMLA provides that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1) (2015). An employer's violation of this provision, regardless of intent, gives rise to an FMLA-interference claim. *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1226–27 (10th Cir. 2012). To establish an FMLA-interference claim, a plaintiff must demonstrate that she was entitled to FMLA leave, that some action by her employer interfered with her right to take FMLA leave, and that the employer's actions were related to the plaintiff's exercise of FMLA rights. *Id.*

Regarding FMLA retaliation, Didier's claim is subject to the now-familiar *McDonnell Douglas* burden-shifting analysis. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006). Again, this framework requires that we ask, in order, whether: (1) the plaintiff has established a prima facie case of discrimination; (2) the defendant can offer a legitimate, nondiscriminatory reason for the employment action; and (3) assuming the defendant can offer such a reason, the plaintiff can produce evidence that the stated reason is a mere pretext for discriminatory intent. *Id.* Here again, it seems both parties have fulfilled their relatively mild burdens on the first two prongs, and our focus is properly on the third.

Both of Didier's FMLA claims, then, come down to whether she can produce some evidence that Abbott's termination decision was either: (1) related to her choice to

23

exercise her FMLA rights, *Brown*, 700 F.3d at 1226; or (2); in fact caused by Abbott's desire to discriminate against Didier for the exercise of her FMLA rights despite Abbott's stated, nondiscriminatory reasons for her termination, *Metzler*, 464 F.3d at 1171. While slightly different, at a bare minimum both of these standards require Didier to show, based on the evidence in the record, that there is at least some question whether Abbott fired her for taking FMLA leave. Unfortunately for Didier, she cannot do this. The unrefuted evidence on the record is that, of those who had to approve Didier's termination, only Comer and Rex knew she was taking FMLA leave. Neither Fendel, who independently investigated the claims against Didier, nor LaFleur, who made the initial recommendation to terminate Didier based on Fendel's investigation, nor any of the five decision-makers other than Comey and Rex—who all had to approve Didier's termination—were even aware that Didier was taking FMLA leave.

Since Didier has presented no evidence that either the independent investigation leading to her termination, or the termination decision itself, was motivated by the exercise of her rights under the FMLA, both her FMLA interference and her FMLA retaliation claims must fail. We therefore affirm the district court's grant of summary judgment on both of these claims.

CONCLUSION

For the reasons stated herein, we AFFIRM the district court's grant of summary judgment to all claims raised in this appeal.

ENTERED FOR THE COURT


Gregory A. Phillips
Circuit Judge

14-3125 – *Didier v. Abbott Laboratories*

**HARTZ**, Circuit Judge, concurring:

I join the opinion of Judge Phillips, which correctly analyzes this case under current law. But this is another good example of the unnecessary complexities arising from our being tethered to the outdated *McDonnell Douglas* framework. Other than for employment-discrimination cases, our review of a summary judgment would be simply to determine whether there was sufficient admissible evidence to support each of the elements of the plaintiff's claim. We would not need to spend time on the artificial distinction between direct and indirect evidence or to worry about going through the progressive steps of a formalistic framework. That process adds nothing to the fairness, reliability, or predictability of our decisions. The *McDonnell Douglas* framework may have once served a purpose when employment-discrimination claims were decided in bench trials before judges whose sensitivity to discrimination was in question. Making judges go through those steps perhaps assisted deserving plaintiffs. Now, however, that framework hardly helps plaintiffs. Rather, it imposes artificial barriers in the way of meritorious suits. And even when the ultimate result is proper, the process unnecessarily consumes the time and effort of attorneys and judges alike. Everything that is useful in the framework—such as the enumeration of factors to consider in determining an employer's motive—could easily be incorporated into the process that we use to evaluate summary judgments in other areas of the law.

1