**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 19, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DONALD L. ETHERTON,

      Plaintiff - Appellee,

v.

OWNERS INSURANCE COMPANY,

      Defendant - Appellant.

No. 14-1164

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:10-CV-00892-PAB-KLM)**
_____

Gregory R. Giometti (Amanda Burke, with him on the briefs), Gregory R. Giometti &
Associates, P.C., Denver, Colorado, appearing for Defendant-Appellant.

Ethan A. McQuinn (Chad P Hemmat, and Jason G. Alleman, with him on the brief),
Anderson, Hemmat & McQuinn, LLC, Greenwood Village, Colorado appearing for
Plaintiff-Appellee.
_____

Before **HARTZ**, **GORSUCH**, and **MATHESON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

## I. INTRODUCTION

On December 19, 2007, a driver rear-ended Donald Etherton's vehicle. The

collision injured Mr. Etherton's back. He filed a claim with his insurer, Owners

Insurance Company ("Owners"), seeking uninsured or underinsured motorist coverage up to his policy limit. After months of back and forth, Owners offered to pay an amount significantly lower than the policy limit. Mr. Etherton sued, alleging claims for (1) breach of contract and (2) unreasonable delay or denial of a claim for benefits under Colo. Rev. Stat. §§ 10-3-1115 and -1116.

A jury found in Mr. Etherton's favor on both claims. The district court entered judgment for Mr. Etherton, awarding $2,250,000 in damages. Owners appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## II. BACKGROUND

### A. *Factual History*

Mr. Etherton filed his claim with Owners on July 6, 2009. His policy included uninsured or underinsured motorist coverage up to $1,000,000. The other driver's insurer settled with Mr. Etherton for $250,000. Mr. Etherton's claim to Owners requested payment up to $750,000, the remainder of his policy limit. Mr. Etherton's vehicle had only minor damage, but he underwent three back surgeries to repair disc damage in his spine.

Between July and December of 2009, Mr. Etherton and Owners communicated frequently. Owners repeatedly indicated it needed additional information to assess his claim. On December 30, 2009, Owners offered to settle for $150,000. Mr. Etherton asked Owners to explain the basis for the low offer. On January 19, 2010, Owners responded, "Our 150k offer is based on the documentation you have provided to date. . . . We note serious questions of causation of Mr. Etherton's injuries . . . ." App. Vol. XII at

2982.  Many additional communications between Mr. Etherton and Owners failed to resolve the matter.  Mr. Etherton initiated this suit in March 2010.

## B. *Procedural History*

Mr. Etherton sued in Colorado state court.  Owners removed the action to federal court, where it was assigned to Judge Krieger.

As trial approached, Owners filed a motion in limine under Federal Rule of Evidence 702, seeking to exclude Dr. Joseph Ramos, Mr. Etherton's causation expert.  Owners argued Dr. Ramos's methodology was not reliable under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  After a Federal Rule of Evidence 104(a) *Daubert* hearing, Judge Krieger ruled from the bench and excluded Dr. Ramos's testimony, concluding his methodology was not reliable.  Shortly thereafter, Mr. Etherton moved for reconsideration.

Judge Krieger recused herself from the case, and it was reassigned to Judge Brimmer, who granted Mr. Etherton's motion to reconsider.  Based upon his review of the *Daubert* hearing transcript, Judge Brimmer concluded Dr. Ramos's methodology was reliable and he therefore could testify.

The court held a six-day jury trial.  At the close of evidence, Owners moved for judgment as a matter of law on Mr. Etherton's claim for the unreasonable delay or denial of an insurance claim under Colo. Rev. Stat. §§ 10-3-1115 and -1116.  The court denied the motion.  The jury returned a verdict in Mr. Etherton's favor on his claims for breach of contract and unreasonable delay or denial.  The jury found Mr. Etherton's noneconomic losses were $375,000, his economic losses were $857,000, and his physical

impairment and disfigurement damages were $150,000. The district court initially entered judgment for a total of $1,500,000. It concluded Mr. Etherton was entitled to $750,000 in breach of contract damages for the remainder of his policy limit, and an additional $750,000 for the unreasonable delay or denial claim under Colo. Rev. Stat. § 10-3-1116.

Owners filed a motion seeking a new trial under Federal Rule of Civil Procedure 59 and renewing its motion for judgment as a matter of law under Federal Rule of Civil Procedure 50. For a new trial, Owners argued the district court had erroneously admitted Dr. Ramos's unreliable expert testimony. For judgment as a matter of law on Mr. Etherton's unreasonable delay or denial claim, it argued that without Dr. Ramos's erroneously admitted testimony, Mr. Etherton failed to prove causation. The court rejected these arguments and denied the motion.

Mr. Etherton moved to amend the judgment under Rule 59(e), arguing Colo. Rev. Stat. § 10-3-1116 permits not just an award of his breach of contract damages multiplied by two, but double his covered benefits in addition to any award for breach of contract damages. The district court granted the motion and amended the judgment to award Mr. Etherton $2,250,000. This amount includes (1) $750,000 for breach of contract, the amount remaining on Mr. Etherton's policy limit, and (2) $1,500,000 for the unreasonable delay or denial claim. The court arrived at the latter figure by doubling the amount of covered benefits, which was the $750,000 left on his $1,000,000 policy after receiving $250,000 from the other driver's insurer.

Owners filed a timely notice of appeal. *See* Fed. R. App. P. 4(a)(1)(A). After oral argument, we sua sponte abated this appeal pending issuance of the Colorado Supreme Court's decision in *American Family Mutual Insurance Co. v. Hansen*, No. 14SC99. The Colorado Supreme Court's grant of certiorari in *Hansen* included two state law questions relevant to this appeal: (1) whether an insurer's denial of a "fairly debatable" claim can be unreasonable, and (2) whether Colo. Rev. Stat. § 10-3-1116 permits an insured whose claim has been unreasonably denied to recover the benefit itself plus a penalty of two times that benefit. *Hansen*, --- P.3d ---, 2016 WL 3398507, at *5 n.3 (Colo. June 20, 2016). On June 20, 2016, the Colorado Supreme Court decided *Hansen* on alternative grounds and did not reach either of the questions relevant to Mr. Etherton's case. *Id.* at *7.

## III. DISCUSSION

Owners appeals the district court's decision (a) denying Owners' motion for a new trial based on the alleged erroneous admission of Dr. Ramos's testimony under Rule 702. Regarding the state-law claims, Owners appeals the district court's decisions (b) denying Owners' motion for judgment as a matter of law based on Owners' purported reasonableness, and (c) granting Mr. Etherton's motion to amend the judgment. We affirm on each issue.

### A.  *Motion for New Trial—Rule 702*

Owners does not contest the Rule 702/*Daubert* standard the district court used to assess Dr. Ramos's testimony. It argues the court erred in applying that standard. We disagree and therefore affirm.

## 1. Standard of Review

We review a district court's application of Rule 702/*Daubert* for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997).[1]  "We must afford *substantial deference* to the district court's application of *Daubert*."  *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)); *accord Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004) (recognizing "the wide latitude a district court has in exercising its discretion to admit or exclude expert testimony").  A court abuses its discretion when its ruling is "arbitrary, capricious, whimsical or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003) (quotations omitted).

"The trial court's broad discretion applies both in deciding how to assess an expert's reliability, including what procedures to utilize in making that assessment, as well as in making the ultimate determination of reliability."  *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 990 (10th Cir. 2003).  As the Supreme Court said in *Kumho Tire*, "The trial judge must have considerable leeway in deciding in a particular

---

[1] This issue is nested in Owners' appeal of the district court's denial of the motion for a new trial, which we also review for abuse of discretion. *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1308 (10th Cir. 2015).  Any reversible defect in the district court's Rule 702 analysis would be a "clear error of judgment or exceed[] the bounds of permissible choice in the circumstances," *Weese v. Schukman*, 98 F.3d 542, 549 (10th Cir. 1996), warranting reversal of the court's denial of a new trial.

case how to go about determining whether particular expert testimony is reliable." 526 U.S. at 152.

When applying Rule 702, "different courts relying on essentially the same science may reach different results," but we could still affirm both decisions due to our "deferential standard of review." *Hollander*, 289 F.3d at 1206.

## 2. Legal Background

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Owners challenges the reliability of Dr. Ramos's methodology, not his qualifications, so we focus on Rule 702's reliability requirements.

Rule 702 imposes a gatekeeping function on district courts to ensure expert testimony is admitted only if it is relevant and reliable. *See Kumho Tire*, 526 U.S. at 141; *Daubert*, 509 U.S. at 597, 589. The "help the trier of fact" language of Rule 702 is a relevance test for expert testimony. *See Daubert*, 509 U.S. at 591. Even if scientifically valid, the expert testimony must "fit"—it must relate to a disputed issue in the case. *Id.* at 591-92.

The reliability determination calls for a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether

that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. These two steps are codified in Rules 702(c) and 702(d). Although many factors may bear on whether expert testimony is based on sound methods and principles, the *Daubert* Court offered five non-exclusive considerations: whether the theory or technique has (1) been or can be tested, (2) been peer-reviewed, (3) a known or potential error rate, (4) standards controlling the technique's operation, and (5) been generally accepted by the scientific community. *See* 509 U.S. at 593-94. "[D]istrict courts applying *Daubert* have broad discretion to consider a variety of other factors." *Hollander*, 289 F.3d at 1205. As the Court said in *Kumho Tire*,

> [W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends on the particular circumstances of the particular case at issue.

526 U.S. at 150.[2]

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "The plaintiff need not prove that the expert is undisputably correct . . . . Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (citation

---

[2] Drawing from court opinions both before and after *Daubert*, the advisory committee note to the 2000 amendment of Rule 702 mentions additional factors. Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

omitted).  Neither Rule 702 nor *Daubert* "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Joiner*, 522 U.S. at 146.

### 3.  *Daubert* **Hearings and the District Court's Rulings**

Judge Krieger held Rule 104(a) *Daubert* hearings on August 17, 2011, and November 17, 2011, to determine the admissibility of the parties' various expert witnesses.  During the second hearing, Owners challenged the reliability of the methodology Dr. Ramos used to form his opinion that Mr. Etherton's "injuries, including lumbar disc protrusion, lumbar facet syndrome, lower extremity paresthesia, lumbar radiculopathy, SI joint dysfunction, myofascial hypertonicity and muscle spasm, and myelopathy of the lower extremities, were entirely caused by the subject collision."  App. Vol. I at 108.  Dr. Ramos testified about his methodology as follows:

> In every case you have to start with a good history, thorough history, a thorough physical examination, a review of any diagnostic studies.  You have to look at the records as they apply, if there is a previous record of injury.  That's important, particularly if it's one that was existing at the time.  And you have to use the medical literature and the knowledge base that you gain as a[] physician and apply to that.
> Now, where that's summarized in the medical literature as far as causation analysis is basically summarized as three major—I guess the macroscopic view of a good history, a good physical examination, and evaluation of the diagnostics, review of preexisting records or preexisting injury history—how that's applied macroscopically is that we look as physicians to say:  Is the injury plausible?  That's the simplest, first question.  And essentially that's asking, Is this possible?  It's usually a fairly low hurdle to clear, and it's usually fairly simple.
> The second thing that we ask is is there a temporal relation between the injuries, the patient's pain complaints that we have found through that

history and that physical examination, those other things that I've identified. Is there a temporal relationship of that to an event?

If the injury is plausible, there is a temporal relationship, we ask a final question, which is: Is there a more likely cause? Is something else more likely that we can attribute to this?

And by following that analysis out, what you gather with those underlying areas that I've outlined, you come to a determination of causation . . . .

App. Vol. V at 1454-55. In short, Dr. Ramos employed a three-step methodology to determine the injury's cause.

First, he determined whether it is plausible that a collision caused the back injury. This step is easily satisfied, he explained, because "[t]here is a lot of literature that shows very specifically if you get rear-ended, you injure your back. Yes, very specifically: disc herniations, facet injuries, absolutely." App. Vol. V at 1475.

Second, he assessed whether a collision likely caused the specific injury by reviewing diagnostic studies, examining the injured person's medical history and physical examinations, and determining whether the collision occurred just before back pain commenced. App. Vol. V at 1485 ("I would want physical exam findings that would coordinate; that would suggest a temporal relation of time; that physical exam coordinates. I've mentioned diagnostic studies as well that are reviewed as part of the medical records.").

Third, he considered whether other, more likely causes produced the injury by reviewing the person's medical history, physical examinations, and any other available information. He testified, "My methodology would include anything else that would be a more likely cause or a better alternative cause for the condition [a patient] was presenting

for. And so that would include the intervening events, anything else essentially that would be a more likely cause." App. Vol. V at 1487. He stated his methodology accounted for the possibility that degeneration caused Mr. Etherton's injuries, and noted "the medical literature would suggest he's at a higher risk for this [type of injury] due to those degenerative changes." *Id.*

Dr. Ramos testified the medical community generally accepts his methodology, which is based on peer-reviewed medical literature studying live crash-testing and on his experience studying the cadavers of people who died in motor collisions. Although he said error rates are a "Pandora's box" in the area of causation determination, the literature "outline[s] the frequency with which people get injured with these things, rear-end impacts particularly . . . . And based on that, certainly you could come out with—with error or not error . . . ." App. Vol. V at 1457-58.

Judge Krieger ruled from the bench that Dr. Ramos's methodology was unreliable and excluded his testimony. She explained Dr. Ramos's methodology was generally accepted in the medical community for treatment purposes, but his methodology did not exclude alternative explanations or causes or include a step to ensure alternative causes are considered. She said Dr. Ramos's methodology was analytically deficient because it purported to demonstrate specific causation based on general population-wide results without consideration of the specifics of Mr. Etherton's collision. Finally, she noted the absence of evidence on rates of error.

On June 7, 2012, Judge Krieger recused herself from the case. It was reassigned to Judge Brimmer. On September 13, 2012, he agreed to revisit the admissibility of Dr.

Ramos's testimony. Upon reconsideration, Judge Brimmer determined Dr. Ramos's testimony was reliable and therefore admissible. He concluded Dr. Ramos's methodology is well accepted in the medical community for medical treatment purposes, and the methodology was reliably applied in this case, including that Dr. Ramos accounted for alternative explanations for the cause of Mr. Etherton's injury. He also concluded Dr. Ramos did not improperly extrapolate his conclusion from general population-wide results and instead employed a reliable causation methodology.

The case proceeded to trial, where Dr. Ramos testified and a jury found in favor of Mr. Etherton. Owners moved for a new trial, arguing the court erred by admitting Dr. Ramos's testimony. The court denied the motion.

**4. Analysis**

Owners contends Dr. Ramos's testimony should have been excluded because (a) the academic literature he cited did not support the first step, (b) the second step relied on the logical fallacy that correlation is causation, and (c) the differential diagnosis in the third step was incomplete. Owners also asserts (d) the district court abused its discretion in exercising its gatekeeping function by failing to review the scientific articles cited by Dr. Ramos. These arguments do not specify whether they are based on Rule 702(c)—the reliability of his principles and methods—or Rule 702(d)—the reliable application of his principles and methods. We will try to sort that out in our analysis. Finally, Owners argues (e) Dr. Ramos's testimony was not helpful under Rule 702(a) because it lacked "fit" for this case.

a. *Step one was not based on an unsupported assumption*

Owners argues Dr. Ramos's first step simply assumed, without scientific support, that any motor collision can cause the type of injuries suffered by Mr. Etherton. This argument does not question reliance on academic literature as a general matter, but does challenge Dr. Ramos's reliance as to Mr. Etherton. It is therefore a Rule 702(d) challenge. Dr. Ramos's *Daubert* hearing testimony indicates he appropriately relied on pertinent publications.

Dr. Ramos testified that the first step asks, "Is the injury plausible? . . . It's usually a fairly low hurdle to clear, and it's usually fairly simple." App. Vol. V at 1455. He explained that "the medical literature is rampant with evidence that rear-end-impact motor vehicle crashes can lead to lumbar spine injury. That peer-reviewed literature clears the plausibility hurdle . . . ." *Id.* at 1470; *see also id.* at 1472-73 ("[T]he medical literature would suggest that the velocity is not a reliable predictor of injury, [and] damage to a vehicle is not a reliable predictor of injury."); *id.* at 1475 ("There is a lot of literature that shows very specifically if you get rear-ended, you injure your back. Yes, very specifically: disc herniations, facet injuries, absolutely.").

Moreover, Dr. Ramos relied on more than academic literature. He testified,

> I've also been an instructor at the Spine Research Institute in San Diego. That's particularly relevant to this case here, because it's largely a biomechanical course. . . . This is one of the few places in the United States . . . that did live human crash test studies, where they actually put occupants into cars, put in black boxes that were donated by various automobile companies, put in seats donated by various automobile companies. We did very high quality research on the kinematics to an occupant of a car at different speeds, at different vectors, at different angles. I was a lecturer at that particular seminar for three years, about.

App. Vol. V at 1451.

In light of Dr. Ramos's reliance on medical literature and his own experience studying spinal injuries from live crash-testing, we disagree with Owners that the first step of his methodology is based on an unsupported assumption.

b. *Step two did not mistake correlation for causation*

Owners argues the second step mistakenly attempted to establish causation only by identifying correlation between Mr. Etherton's collision and injury. This argument challenges Dr. Ramos's reliance on correlation generally, and is therefore a Rule 702(c) challenge. Owners overstates the role of this step. Dr. Ramos did not rely solely on temporal proximity to determine specific causation.

Although correlation alone may be insufficient to establish causation, *see, e.g.*, *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 885 (10th Cir. 2005) ("A correlation does not equal causation."); *Goebel*, 346 F.3d at 999 ("The court is not permitted to . . . rely on the temporal relationship [between an injury and a purported cause] by itself as evidence of causation."), it is nonetheless relevant to identifying causal relationships. Indeed, it may be "a necessary but not sufficient condition for causation." Joseph F. Healey, The Essentials of Statistics 350 (4th ed. 2015); *see also United States v. Valencia*, 600 F.3d 389, 425 (5th Cir. 2010) ("Evidence of mere correlation, even a strong correlation, is often spurious and misleading when masqueraded as causal evidence, because it does not adequately account for other contributory variables. However where evidence of correlation itself is potentially relevant and unlikely to mislead the jury, an expert who reliably discerns this relationship can present such

- 14 -

conclusions to the jury.").  The temporal relationship between an injury and a purported

cause can be a relevant factor in a broader causation determination.  *See, e.g.*, *Goebel*,

346 F.3d at 999.

Temporality was only one factor in Dr. Ramos's three-step methodology.  He first

concluded the collision plausibly caused Mr. Etherton's injury.  He next examined Mr.

Etherton's medical records[3] to determine whether the injury coincided with the collision.

He then considered alternative explanations for the injury based on diagnostic testing and

Mr. Etherton's medical history and physical examinations, including those conducted

immediately after the collision.

Dr. Ramos therefore did not rely solely on correlation.  Instead, the second step

considered whether Mr. Etherton's injuries coincided with the purported cause.  The

temporal relationship between an injury and its potential cause is relevant because, if Dr.

Ramos had found no correlation between the injury and the collision, that could indicate

no causal relationship.  Dr. Ramos's consideration of the temporal relationship between

Mr. Etherton's injury and the collision was an appropriate part of his broader analysis.

c. *Step three accounted for alternative causes*

Owners argues Dr. Ramos incorrectly applied differential diagnosis at step three

by ruling out unlikely alternative causes but not likely ones.  Owners specifically

---

[3] Owners also argues the second step of Dr. Ramos's methodology is unreliable because it depends on self-reported and subjective data reported by Mr. Etherton.  But Dr. Ramos's testimony clearly indicates this step was based on Mr. Etherton's medical records, which included physical examinations and an MRI, and consequently were not solely dependent on self-reported data.

contends Dr. Ramos considered only traumatic alternative explanations and failed to account for degeneration.[4] This is a Rule 702(d) challenge.

This court has recognized that differential diagnosis can reliably determine causation. *See Bitler*, 400 F.3d at 1236; *Goebel*, 346 F.3d at 1000. Owners does not contest the reliability of the method itself. "Differential diagnosis refers to the process by which a physician rules in all scientifically plausible causes of the plaintiff's injury. The physician then rules out the least plausible causes of injury until the most likely cause remains." *Hollander*, 289 F.3d at 1209 (quotations and alterations omitted). "Experts must provide objective reasons for eliminating alternative causes when employing a differential analysis." *Bitler*, 400 F.3d at 1237 (quotations omitted). "[B]ut this is not to say that an expert, in order to testify on causation, must be able to categorically exclude each and every possible alternative cause—to require otherwise would mean that few experts would ever be able to testify." *Id.* at 1238 n.6 (quotations and alterations omitted).

Contrary to Owners' position, Dr. Ramos did consider alternative causes for Mr. Etherton's injuries, including degeneration. Dr. Ramos testified that he ruled out alternative explanations based on "my history with Mr. Etherton, my findings on physical examination, the diagnostic testing that I had available to me through the course of his care, [and] the lack of predated records that would otherwise steer me that his condition

---

[4] Owners also contends the third step is unreliable because it is predicated on step one being reliable. This argument fails because we reject Owners' challenge to step one.

had preexisted." App. Vol. V at 1458. In so doing, Dr. Ramos considered "anything else that would be a more likely cause or a better alternative cause for the condition [Mr. Etherton] was presenting for," including degeneration due to genetics or aging. *Id.* at 1487.

Dr. Ramos concluded non-traumatic daily activities did not likely cause Mr. Etherton's injuries because "the medical literature would suggest that . . . the more likely cause would be a traumatic force." *Id.* at 1489. Dr. Ramos also acknowledged that "the medical literature would suggest [Mr. Etherton is] at a higher risk for [injury] due to those degenerative changes," *id.*, which confirms he considered degeneration as an alternative cause. He maintained that the collision was the "most likely cause," *see Hollander*, 289 F.3d at 1209, while noting Mr. Etherton might have been more susceptible to injury because of degeneration. Rule 702 does not demand that Dr. Ramos "categorically exclude each and every possible alternative cause," *Bitler*, 400 F.3d at 1238 n.6 (quotations omitted), including degeneration, to testify to causation.

Moreover, when the court denied Owners' motion for a new trial, it relied on the following deposition testimony from Dr. Ramos refuting the possibility that Mr. Etherton's injury was due solely to degeneration: "[I]t's likely that Mr. Etherton had some degenerative changes in his low back associated with just age and time that were mild," but "a disk as is described in April of '08 that starts to lateralize to the right, that's more concerning that maybe there was some compressive forces across his degenerative disk that forced it to the right and that may be more crash related." App. Vol. IV at 1156-57.

- 17 -

Dr. Ramos considered alternative explanations for Mr. Etherton's injuries. He ruled them out based on his physical examination of Mr. Etherton and his assessment of Mr. Etherton's medical history. Concluding Dr. Ramos complied with Rule 702(d) was within the district court's discretion.

d. *Failure to review Dr. Ramos's scientific articles was not an abuse of discretion*

During the *Daubert* hearing, Dr. Ramos testified that academic literature supported his causation methodology. He identified multiple sources. Owners complains the district court did not discuss or even review this material, which is a challenge to the court's Rule 702 review.

"[A] district court has discretion to limit the information upon which it will decide the *Daubert* issue . . . ." *Dodge*, 328 F.3d at 1228; *see Goebel*, 346 F.3d at 990 (recognizing the district courts' broad discretion in deciding how to assess an expert's reliability). The district court noted that Dr. Ramos's approach is generally accepted in the medical community for treatment. It carefully considered—and ultimately rejected—critiques of the methodology's specific causation component. It explained that the methodology is similar to those previously found reliable in this circuit. And it acknowledged the academic literature when denying Owners' motion for a new trial. The court's analysis indicates it adequately considered whether Dr. Ramos's methodology was scientifically sound and reliably applied. We afford substantial deference to its reasoned conclusion that his testimony was reliable and conclude the court did not abuse its discretion.

e. *Dr. Ramos's methodology properly "fit"*

Owners argues Dr. Ramos's methodology lacked "fit" for demonstrating causation, and was therefore not helpful. This is a Rule 702(a) challenge. Owners contends Dr. Ramos's methodology may be accepted for treatment but is not reliable for tort causation determinations because identifying the precise cause of an injury is not a critical element of treatment.

"Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quotations omitted). *Daubert* described such testimony as lacking "fit." *See id.* "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

Owners cites only *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2001), in which this court considered whether a district court erred by excluding an expert's testimony because the proposed expert was not qualified. *Id.* at 969-70. The putative witness was a board-certified orthopedic surgeon whose opinions about a specialized topic (intramedullary nailing) were based only on general orthopedic and surgical principles and concepts. *Id.* She had admitted having little or no knowledge about the specialized subject and conceded she was not an expert in that area. *Id.* at 969. We affirmed, explaining that "merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Id.*

*Ralston* is inapposite. Dr. Ramos's qualifications are not contested. His opinions about Mr. Etherton's injuries did not rely solely on generalized knowledge but also on his

- 19 -

specialized experience treating musculoskeletal injuries and studying spinal injuries caused by motor collisions. Moreover, Dr. Ramos testified the collision caused Mr. Etherton's injuries—a central issue. His testimony "fit" the case.

*   *   *   *

In sum, the district court properly applied Rule 702/*Daubert* to Dr. Ramos's testimony and did not abuse its discretion.

### B.   State-Law Claims

Owners also appeals the district court's decisions denying Owners' motion for judgment as a matter of law and granting Mr. Etherton's motion to amend the judgment. Both motions relate to Mr. Etherton's state-law claims.

When jurisdiction is based on the parties' diverse citizenship, a federal court must assess state law claims based on the substantive law of the state. *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 (10th Cir. 2014). Our objective when interpreting and applying state substantive law is to reach the same result that would be reached in state court. *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1204 (10th Cir. 2011). If the state's highest court has interpreted a state statute, we defer to that decision. *See Long v. St. Paul Fire & Marine Ins. Co.*, 589 F.3d 1075, 1081 (10th Cir. 2009). If the state's highest court has not interpreted a state statute, we instead predict how that court would rule. *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1093 (10th Cir. 2010). "The decisions of lower state courts, while persuasive, are not dispositive." *Long*, 589 F.3d at 1081. "The decision of an intermediate appellate state court is a datum for ascertaining state law

- 20 -

which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Stickley v. State Farm Mut. Auto Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007) (quotations omitted).

"When interpreting a state statute in a diversity case, this court must apply state rules of statutory construction." *United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 573 F.3d 997, 1001 (10th Cir. 2009). Under Colorado law, the "primary task in construing a statute is to give effect to the intent of the General Assembly," which requires courts to "look first to the plain language of the statute." *Farmers Grp., Inc. v. Williams*, 805 P.2d 419, 422 (Colo. 1991); *see* Colo. Rev. Stat. § 2-4-212. "[A] statute must be read and considered as a whole. Where possible, the statute should be interpreted so as to give consistent, harmonious, and sensible effect to all its parts." *People v. Dist. Court*, 713 P.2d 918, 921 (Colo. 1986) (citation omitted); *see* Colo. Rev. Stat. § 2-4-101.

## 1. Motion for Judgment as a Matter of Law—Unreasonable Delay or Denial Claim

At the close of evidence, Owners moved, under Federal Rule of Civil Procedure 50(a), for judgment as a matter of law on Mr. Etherton's statutory claim against Owners for unreasonable delay or denial of benefits. Owners argued the evidence showed it had acted reasonably as a matter of law, which foreclosed any basis for Mr. Etherton's claim.

The district court denied the motion, concluding Mr. Etherton presented sufficient evidence to submit the claim to the jury.[5] We affirm.

a. *Standard of Review*

We review de novo a district court's decision to grant or deny a motion for judgment as a matter of law, applying the same legal standards as the district court. *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1112-13 (10th Cir. 2004). "Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." *Elm Ridge Expl. Co. v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013). "We draw all inferences from the evidence in favor of the non-moving party, and do not weigh the evidence or judge witness credibility." *Henry v. Story*, 658 F.3d 1235, 1238 (10th Cir. 2011).

b. *Legal Background*

Mr. Etherton asserted a claim for the unreasonable delay or denial of his claim for benefits under Colo. Rev. Stat. §§ 10-3-1115 and -1116.

Colo Rev. Stat. § 10-3-1115(1)(a) provides,

> A person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant.

---

[5] To seek appellate review of an argument raised in a Rule 50(a) motion, a party must reassert its argument under Rule 50(b) after trial. *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1250 n.1 (10th Cir. 2013). Although Owners argued only the Dr. Ramos issue in its Rule 50(b) motion, Mr. Etherton does not contest whether we can review Owners' Rule 50(a) argument on appeal.

- 22 -

Colo. Rev. Stat. § 10-3-1116(1) states,

> A first-party claimant . . . whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit.

A few other provisions are pertinent to our discussion. "First-party claimant" is defined in Colo. Rev. Stat. § 10-3-1115(b)(I) as "an individual . . . asserting an entitlement to benefits owed directly to . . . an insured under an insurance policy." Mr. Etherton is a first-party claimant under the statute.

Colo. Rev. Stat. § 10-3-1115(2) explains "an insurer's delay or denial was unreasonable if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action."

Colo. Rev. Stat. § 10-3-1113(4) addresses what constitutes reasonable conduct by an insurer:

> In determining whether an insurer's delay or denial was reasonable, the jury may be instructed that willful conduct of the kind set forth in section 10-3-1104(1)(h)(I) to (1)(h)(XIV) is prohibited and may be considered if the delay or denial and the claimed injury, damage, or loss was caused by or contributed to by such prohibited conduct.

Colo. Rev. Stat. § 10-3-1104(1)(h) proscribes a variety of unfair claim settlement practices. For example, insurers may not refuse claims without conducting a reasonable investigation, *id.* § 10-3-1104(h)(IV), or fail to promptly provide a reasonable explanation for a denied claim or a settlement offer, *id.* § 10-3-1104(h)(XIV).

c. *Analysis*

Owners argues (i) the insurance agreement provides that the "amount of damages Etherton is legally entitled to recover is to be determined by agreement," and further argues it did not violate § 10-3-1115(1)(a) because "no agreement had been reached as to benefits 'owed'" when Mr. Etherton filed suit. *Id*. at 44-45. Owners also contends (ii) it did not unreasonably delay or deny Mr. Etherton's claim because his claim was fairly debatable and Owners' actions were objectively reasonable. These arguments fail.

### i. Mr. Etherton's Insurance Agreement Does Not Preclude an Unreasonable Delay or Denial Claim

Mr. Etherton's insurance agreement states: "Whether an injured person is legally entitled to recover damages and the amount of such damages shall be determined by an agreement between the injured person and us." App. Vol. XIII at 3107 (emphasis omitted). This provision concerns whether and how much Mr. Etherton is entitled to damages for injuries caused by the uninsured motorist.

Owners argues it cannot be liable for unreasonably delaying or denying Mr. Etherton's claim for benefits because this contract provision requires that it first agree to what it owes, and it never did. This understanding would immunize insurers from liability for unreasonable delay or denial of a claim for benefits so long as the insurer disagrees with how much is owed. In addition to being an unreasonable interpretation of the contract, this reading conflicts with Colo. Rev. Stat. § 10-3-1115(1)(a), which states: "A person engaged in the business of insurance shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant." The

- 24 -

statute does not require that the insurer agree to a certain amount of damages before an unreasonable delay and denial can occur.

Under Owners' reading, the narrow contract provision would override the more broadly worded statute. The provision would therefore be void under Colorado law. *See, e.g.*, *Aetna Cas. & Sur. Co. v. McMichael*, 906 P.2d 92, 101 (Colo. 1995) (en banc) ("Insurance policy clauses that are contrary to a provision of a statute are void as against public policy."); *Radil v. Nat'l Union Fire Ins. Co.*, 207 P.3d 849, 852 (Colo. App. 2008) (same). We further spell out here why the plain meaning of the statute conflicts with Owners' reading of its contract with Mr. Etherton.

First, Owners' reading would mean the statute could prohibit only unreasonable delays or denials of payments an insurer has already agreed it owes. But if an insurer unreasonably denies a payment owed under the insurance agreement, the insured can already seek redress through a breach of contract claim (which Mr. Etherton did). It would make little sense to interpret § 10-3-1115 as creating a new cause of action for harms already addressed elsewhere in Colorado law. The statute proscribes an insurer's unreasonable handling of an insured's claim for benefits, not simply the unreasonable delay or denial of payments the insurer has determined are owed.

Second, the word "deny" includes the insurer's decision not to approve a claim for benefits, not simply a refusal to pay benefits that are indisputably owed. The statute is not confined to claims where the payment is due and owing. It proscribes unreasonable denials, and if an insurer denies a claim for benefits, the payment is not due and owing.

Third, the surrounding subsections indicate the statute applies to claims for disputed benefits, not simply those where the amount is due and owing. Section 10-3-1115(2) states "an insurer's delay or denial was unreasonable if the insurer delayed or denied *authorizing payment of a covered benefit* without reasonable basis for that action." Colo. Rev. Stat. § 10-3-1115(2) (emphasis added). If subsection (1)(a) were understood to apply only when a payment of benefits is due and owing, the language in subsection (2) would be superfluous. Similarly, § 10-3-1116 provides, "A first-party claimant . . . whose *claim for payment of benefits* has been unreasonably delayed or denied may bring an action in a district court . . . ." *Id.* § 10-3-1116 (emphasis added). This section creates a right of action for the conduct described in § 10-3-1115, and describes the action as arising from the unreasonable delay or denial of claims, not simply payments due and owing.

Fourth, the Colorado Court of Appeals has construed the statute, consistent with our interpretation, to require for liability "only that a first-party *claim be denied* without a reasonable basis." *Vaccaro v. Am. Family Ins. Grp.*, 275 P.3d 750, 756 (Colo. App. 2012) (emphasis added). In *Vaccaro*, the court upheld a jury verdict under Colo. Rev. Stat. §§ 10-3-1115 and -1116 where a payment was not due and owing. *Id.* at 753-54, 760.

In sum, Owners' interpretation of the contract provision is unreasonable and would be void as against public policy as stated in Colo. Rev. Stat. § 10-3-1115.

### ii. Unreasonable Delay

Owners asserts Mr. Etherton's claim under § 10-3-1115 fails as a matter of law because (1) Owners had a reasonable basis to dispute whether the collision caused Mr. Etherton's injuries, and (2) Owners' expert evidence demonstrated its conduct was objectively reasonable because it complied with industry standards.

### 1) Reasonable basis to dispute

According to the Colorado Court of Appeals, an insurer's delay or denial of benefits is not necessarily reasonable under Colo. Rev. Stat. §§ 10-3-1115 simply because the claim for benefits was fairly debatable. *Hansen v. Am. Fam. Mut. Ins. Co.*, 2013 WL 6673066, at *6-7 (Colo. App. Dec. 19, 2013), *rev'd on other grounds*, --- P.3d ---, 2016 WL 3398507. "[I]f a reasonable person would find that the insurer's justification for denying or delaying payment of a claim was 'fairly debatable,' this weighs against a finding that the insurer acted unreasonably. Nevertheless, fair debatability is not a threshold inquiry that is outcome determinative as a matter of law." *Vaccaro*, 275 P.3d at 759-60 (quotations and citations omitted). Under this authority, an insurer could unreasonably delay or deny a claim for benefits even if that claim is fairly debatable. *See Fisher v. State Farm Mut. Auto. Ins. Co.*, No. 13CA2361, 2015 WL 2198515, at *4-5 (Colo. App. May 7, 2015) ("[W]e disagree with [Defendant] that, under section 10-3[-]1115, an insurer's decision to delay or deny payment of a 'fairly debatable' UIM claim cannot be unreasonable as a matter of law."); *Hansen*, 2013 WL 6673066, at *6-7; *Vaccaro*, 275 P.3d at 759.

- 27 -

We agree with the foregoing authority and conclude that, under Colorado law, fair debatability can be a relevant but not necessarily a determinative factor as to whether the insurer acted reasonably.[6] We also agree with the district court that Mr. Etherton had presented sufficient evidence that Owners unreasonably delayed his claim, thereby precluding judgment as a matter of law on his unreasonable delay or denial claim. For example, Mr. Etherton's evidence showed that after months of communication, Owners sent a letter on January 2010 to Mr. Etherton's counsel expressing concerns about causation because of Mr. Etherton's "preexisting shoulder condition and the fact that he went without treatment for any back complaints for several months." App. Vol. XII at 2982. But this conflicted with documentation Mr. Etherton provided months earlier showing he sought treatment for back pain two weeks after the accident. [App. Vol. XII at 2988 (attorney letter from July 2009 to Owners summarizing documentation sent); App. Vol. XIII at 3157 (notes from January 3, 2008—two weeks after the accident— describing results from Longmont Clinic's x-ray of Mr. Etherton's spine).]

2) Compliance with industry standards

Owners alternatively argues the claim should not have been submitted to the jury because Owners complied with industry standards and therefore acted reasonably, especially in light of its compliance with Colorado's insurance claim regulations. This

---

[6] As explained above, the Colorado Supreme Court granted certiorari in *Hansen* to decide this question but ended up resolving the case on grounds that did not require reaching the issue. 2016 WL 3398507, at *7.

argument fails because Mr. Etherton presented sufficient evidence for the jury to find Owners did not comply with industry standards and therefore acted unreasonably.

"The reasonableness of an insurer's conduct is determined objectively, based on proof of industry standards." *Fisher*, 2015 WL 2198515, at *9. At trial, Mr. Etherton's expert witness, Richard Kaudy, testified that objective industry standards "come from many sources, including the legislature, the Unfair Claims Settlement Practices Act, manuals from carriers, . . . [and] decisions by Colorado courts." App. Vol. VIII at 2066.

Colorado's Unfair Claims Settlement Practices Act is codified at Colo. Rev. Stat. §§ 10-3-1101 to -1116. Under the Act, "[i]n determining whether an insurer's delay or denial was reasonable, the jury may be instructed that willful conduct of the kind set forth in section 10-3-1104(1)(h)(I) to (1)(h)(XIV) is prohibited . . . ." Colo. Rev. Stat. § 10-3-1113(4). The latter provision prohibits "[f]ailing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." *Id.* § 10-3-1104(1)(h)(XIV). Mr. Kaudy testified that Owners failed to provide a reasonable explanation for its $150,000 offer. He also testified Owners denied Mr. Etherton's claim before investigating it, in violation of § 10-3-1104(1)(h)(IV), which prohibits "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information."

Owners countered with its expert witness, Garth Allen, who testified that Owners satisfied industry standards by explaining in the offer notification letter that the $150,000 offer was "based on the supporting documentation that [Mr. Etherton] provided." App.

Vol. X at 2601. Mr. Allen's testimony provided a competing view, but we cannot as an appellate court weigh evidence or judge the credibility of witnesses. Viewing the evidence in a light most favorable to Mr. Etherton, *see Henry*, 658 F.3d at 1238, the jury could reasonably have found in Mr. Etherton's favor based on Mr. Kaudy's testimony. As such, the district court did not err in denying Owners' motion for judgment as a matter of law.[7]

* * * *

The district court correctly denied Owners' motion for judgment as a matter of law. Colo. Rev. Stat. § 10-3-1115 applies to first-party claims for benefits, including those where the amount owed is not yet determined. And sufficient evidence was presented to allow a reasonable jury to find in Mr. Etherton's favor on his unreasonable delay or denial claim.

## 2. Mr. Etherton's Rule 59(e) Motion to Amend the Judgment

The district court granted Mr. Etherton's motion to amend the judgment and increased his damages award from $1,500,000 to $2,250,000 based on its interpretation

---

[7] Owners contends it complied with Colorado's regulation governing the "circumstances under which penalties will be imposed for failure to make timely decisions and/or payment on first party claims." 3 Colo. Code Regs. 702-5:5-1-14 § 2. The regulations require insurers to "make a decision on claims and/or pay benefits . . . within sixty (60) days after receipt of [the claim] . . . unless there is a reasonable dispute between the parties concerning such claim." *Id.* § 4(A)(1). Even if we accept Owners' argument that it complied because it had concerns about causation, it is not entitled to judgment as a matter of law. The regulations only provide minimum standards to avoid penalties. Although an insurer may act unreasonably if it violates the regulation, it does not follow an insurer acts reasonably if it meets the regulation's minimum standards.

of Colo. Rev. Stat. § 10-3-1116. Owners unsuccessfully challenged this interpretation in opposition to the Rule 59(e) motion. We affirm.

    a. *Standard of Review*

We review Rule 59(e) decisions for abuse of discretion. To reverse, we must have "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Headwaters Res., Inc. v. Ill. Union Ins. Co.*, 770 F.3d 885, 899 (10th Cir. 2014) (quotation omitted). "The abuse of discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions." *ClearOne Commc'ns, Inc. v. Biamp Sys.*, 653 F.3d 1163, 1178 (10th Cir. 2011) (quotation omitted). "Pure questions of statutory interpretation are reviewed de novo." *Stickley*, 505 F.3d at 1076.

    b. *Colo. Rev. Stat. § 10-3-1116*

Colo. Rev. Stat. § 10-3-1116 provides,

> (1) A first-party claimant as defined in section 10-3-1115 whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit.
> . . . .
> (4) The action authorized in this section is in addition to, and does not limit or affect, other actions available by statute or common law, now or in the future. Damages awarded pursuant to this section shall not be recoverable in any other action or claim.

Colo. Rev. Stat. § 10-3-1116. Subsection (1) describes damages, fees, and costs awardable for actions under Colo. Rev. Stat. § 10-3-1115. Subsection (4) describes how the statutory right of action authorized in § 10-3-1115 relates to other actions or claims.

c. *Analysis*

It bears repeating that Mr. Etherton prevailed at trial on both his claim for breach of contract and his claim for unreasonable delay or denial, and that the court concluded the most he could recover on his breach of contract claim was $750,000, the remainder of his policy limit. Owners argues § 10-3-1116 caps Mr. Etherton's damages at two times his covered benefit—2 x $750,000 = $1,500,000. It contends the statute prohibits a plaintiff from recovering damages for the covered benefit in a separate action (for example, a breach of contract claim) while also recovering two times the covered benefit under § 10-3-1116 for an unreasonable delay or denial claim. The district court disagreed, and so do we.

Mr. Etherton asserts §§ 10-3-1115 and -1116 create a statutory right of action to compensate for the unreasonable delay or denial of a claim for benefits, a claim that is distinct from the insured's underlying entitlement to benefits under the insurance contract. He argues the damages provision in § 10-3-1116 imposes a penalty that is calculated based on the amount of the covered benefit, and does not displace the insured's entitlement to the covered benefit in a separate action for breach of contract. He therefore concludes the district court's calculation was correct—$750,000 + 2 x $750,000 = $2,250,000.

We agree with Mr. Etherton that Colo. Rev. Stat. § 10-3-1116 permits damages for a claim under § 10-3-1115—calculated as two times the covered benefit—in addition to recovery of the covered benefit through a breach of contract claim. The statute's text and the Colorado Court of Appeals' interpretation of the statute support this conclusion.

Section 10-3-1116(1) does not displace the insured's potential entitlement to benefits for breach of contract under an insurance agreement. Instead, it allows an award of up to two times the covered benefit when an insurer is found liable for unreasonable delay or denial under § 10-3-1115. Section 10-3-1116(1) does not state this award includes the insured's payment for the covered benefit itself; it simply uses the covered benefit as a metric by which the penalty is calculated.

Section 10-3-1116(4) makes this distinction clear: "The action authorized in this section is in addition to, and does not limit or affect, other actions available by statute or common law, now or in the future. Damages awarded pursuant to this section shall not be recoverable in any other action or claim." Colo. Rev. Stat. § 10-3-1116(4). Sections 10-3-1115 and -1116 therefore describe a cause of action (unreasonable delay or denial of a claim) that is distinct from others, such as breach of contract. To adopt Owners' interpretation of § 10-3-1116(1) as precluding an additional award for the covered benefit in a separate breach of contract claim would "affect" another right of action because it would effectively abrogate the common law remedy of damages for breach of contract. Absent clear statutory language and intent from the Colorado legislature, we decline to adopt such an interpretation. *See Farmers Grp.*, 805 P.2d at 423 ("Although [Colorado law] expressly grants the General Assembly the right to abrogate common-law remedies, we will not lightly infer a legislative abrogation of that right absent a *clear* expression of intent." (quotations omitted)).

Owners asserts the district court's interpretation of § 10-3-1116 leads to the absurd result of permitting treble damages when the legislature limited damages in § 10-3-1116

- 33 -

to "two times the covered benefit." But the court's interpretation did not treble the insured's damages. Section 10-3-1115 provides a cause of action distinct from a breach of contract action. Under a breach of contract claim, the insured may be entitled to recovery of the covered benefit. And under the § 10-3-1115 claim, the insured may be entitled to two times the covered benefit, as explained in § 10-3-1116. In total, the damages may equal three times the covered benefit, but not because the damages were trebled. The insured's recovery would be predicated on liability for two distinct causes of action—the insurer's breach of contract and its unreasonable delay or denial of a claim.

Owners also argues allowing recovery of the covered benefit in a separate action renders the second sentence in § 10-3-1116(4) meaningless. Subsection (4) states: "Damages awarded pursuant to this section shall not be recoverable in any other action or claim." Colo. Rev. Stat. § 10-3-1116(4). This provision clarifies that the double recovery allowed in § 10-3-1116(1) applies only to the unreasonable delay or denial claim under § 10-3-1115. Nothing in § 10-3-1115 or § 10-3-1116 provides for recovery of the covered benefit itself. Subsection (4) therefore does not preclude recovery for the covered benefit itself in a separate claim, such as breach of contract. In other words, the penalty provisions in § 10-3-1116 are available only if an insured succeeds on a § 10-3-1115 claim. If the insured simply asserts a breach of contract claim, he or she cannot recover the damages authorized by § 10-3-1115.

The Colorado Court of Appeals reached the same conclusion, holding that a claimant asserting an unreasonable delay or denial claim can "receive the covered benefit

*and also* receive two times the amount of the benefit." *Hansen*, 2013 WL 6673066, at

*10. It said "section 10-3-1116 explicitly contemplates and countenances that a plaintiff

may simultaneously bring a breach of contract claim to recover certain benefits he was

denied and a section 1116 claim for double those benefits *if they were unreasonably

denied*." *Id.* at *10 (quotations and alterations omitted).[8]

We conclude the district court correctly interpreted § 10-3-1116 as permitting

damages for a § 10-3-1115 claim in the amount of two times Mr. Etherton's covered

benefit in addition to any damages available to him under his breach of contract claim.

We also conclude the court did not abuse its discretion by granting Mr. Etherton's motion

to amend the judgment.

The district court's order amending the judgment indicated the jury found, by a

preponderance of the evidence, that Owners (1) breached its insurance contract with Mr.

Etherton, and (2) unreasonably delayed or denied payment of Mr. Etherton's insurance

benefits. The jury further found Mr. Etherton's damages for physical impairment or

---

[8] As explained above, the Colorado Supreme Court granted certiorari in *Hansen* to decide whether a § 10-3-1116 plaintiff can "recover two times the covered benefit in addition to the covered benefit itself." *Hansen*, 2016 WL 3398508 at *12 n.3. We abated this appeal pending the Court's decision in *Hansen*, which was announced on June 20, 2016. Because the Court held the insurer in *Hansen* reasonably denied coverage, it did not address plaintiffs' ability to recover simultaneously for breach of contract and unreasonable delay or denial of benefits. *Id.* at *7.

A separate Tenth Circuit panel recently construed § 10-3-1116, concluded "the damages awarded pursuant to section 10-3-1116 are not coextensive with the contract damages awarded under a common law breach of contract claim," and affirmed an award in "the amount of the insurance benefit owed on the breach of contract claim and an additional two times that benefit under section 10-3-1116." *Home Loan Inv. Co. v. St. Paul Mercury Ins. Co.*, --- F.3d ---, 2016 WL 3610054, at *6 (10th Cir. July 5, 2016).

disfigurement were $150,000, his noneconomic losses were $375,000, and his economic losses were $857,000. The district court explained these damages exceeded the remainder of Mr. Etherton's policy limit, which was $750,000. The court therefore entered judgment in the amount of $2,250,000—$750,000 for Mr. Etherton's breach of contract claim, and $1,500,000 for his unreasonable delay or denial claim.

We do not detect errors in the district court's award or any abuse of discretion and therefore affirm.

## IV. CONCLUSION

We affirm on all grounds. First, the district court properly applied Rule 702/*Daubert* and did not abuse its discretion by finding Mr. Etherton's expert's methodology reliable and admitting his expert testimony. Second, the court correctly denied Owners' motion for judgment as a matter of law because §§ 10-3-1115 and -1116 applied and because, when viewed in the light most favorable to the nonmoving party, Mr. Etherton presented evidence that would allow a reasonable jury to find in his favor even if we assume his claim for benefits was fairly debatable. Third, the district court correctly interpreted § 10-3-1116 and properly exercised its discretion to amend the judgment to increase Mr. Etherton's damages award.

14-1164 – *Etherton v. Owners Insurance Company*

**HARTZ,** Circuit Judge, concurring, joined by **GORSUCH**, J.

I join.

I confess, however, some confusion about Colorado law. In particular, can an insurer be liable under Colo. Rev. Stat. § 10-3-1116 if it reasonably believes that it has provided no coverage for the injury? One might infer that the answer is no from language in the Colorado Supreme Court's recent decision in *Am. Family Mut. Ins. Co. v. Hansen*, 2016 WL 3398507 (June 20, 2016). After ruling that the insurance policy, on its face (but before reformation), did not provide coverage, the court wrote, "Hansen's statutory claim must therefore fail, because American Family had a reasonable basis for denying coverage." *Id.* at 7. This conclusion makes sense, because it is reasonable to delay payment if it is reasonable to believe that no payment is due.

What complicates matters is that the state Court of Appeals had said in the same case that American Family could be liable under the statute even if its denial of coverage was a "fairly debatable" position. And the Supreme Court said, "Because we find that American Family had a reasonable basis for denying coverage based on the unambiguous language of the contract, we need not consider its alternative argument that its denial of coverage was, at the very least, a 'fairly debatable' position." *Id.* This sentence leaves open the possibility that a "fairly debatable" position may not be a "reasonable" position and would leave an insurer open to potential statutory liability if its position was merely "fairly debatable."

But a jury instruction in this case said, "A justification is 'fairly debatable' if reasonable minds could disagree as to the coverage-determining facts or law." Aplt. App. at 776. It seems to me that a reasonable person could infer from the instruction that there is no difference between "fairly debatable" and "reasonable." As a result, the jury may have found Owners liable under the statute even though it thought that Owners took a reasonable position in rejecting causation. But Owners does not pursue that point on appeal. Because I believe, although it is a close case, that the jury could have found Owners' position on causation unreasonable, I agree with affirmance.